# 24-2975

*To Be Argued By*:
ROBERT M. POLLACK

# United States Court of Appeals
## For the Second Circuit

◆◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

WILLIAM YOUNG SR., also known as BILL,

*Defendant,*

KENT BULLOCH,

*Defendant-Appellant.*

_____

**On Appeal From The United States District Court
For The Eastern District of New York**

## BRIEF AND APPENDIX FOR THE UNITED STATES

JOSEPH NOCELLA, JR.,
*United States Attorney*,
*Eastern District of New York*
271-A Cadman Plaza East
Brooklyn, New York 11201
(718) 254-7000

MICHAEL W. GIBALDI,
ROBERT POLLACK,
*Assistant United States Attorneys*,
*Of Counsel.*

i

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.................................................................iii

PRELIMINARY STATEMENT................................................... 1

STATEMENT OF FACTS .......................................................... 3

 I. The Defense Production Act of 1950 and the President's Designation of Scarce Materials in Response to the COVID-19 Pandemic ................................... 3

 II. The Offense Conduct .............................................. 5

 III. Proceedings in the District Court ......................................... 11

 IV. Appeal to a District Judge and Affirmance ......................... 14

SUMMARY OF ARGUMENT ................................................. 17

ARGUMENT - BULLOCH'S CONVICTION SHOULD BE AFFIRMED ................................................................. 19

 I. Standard of Review ........................................................... 19

 II. The Act Unambiguously Proscribes Bulloch's Conduct........................................................................... 19

  A. Bulloch's Strained Interpretation of the Statute Rejects Its Plain Meaning.............................. 20

  B. Bulloch's Strained Interpretation of the Statute Creates Surplusage and Violates the Canon of Meaningful Variation........................... 28

  C. Bulloch's Argument Defies Supreme Court Guidance on Prefatory Clauses ................................. 32

  D. Bulloch Misconstrues the Statute's Legislative History....................................................37

ii

E.     The Statute Is Unambiguous and the Rule
       of Lenity Does Not Apply ...............................................39

CONCLUSION .................................................................................45

iii

## TABLE OF AUTHORITIES

Page

### CASES

*Boyce Motor Lines v. United States,*
  342 U.S. 337 (1952) ................................................................. 43

*Corley v. United States,*
  556 U.S. 303 (2009) ................................................................ 30

*Daniel v. Am. Bd. of Emergency Medicine,*
  428 F.3d 408 (2d Cir. 2005) ......................................... 20, 37

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ........................................................ 33, 34

*Grayned v. City of Rockford,*
  408 U.S. 104 (1972) ................................................................ 41

*Kingdomware Techs., Inc. v. United States,*
  579 U.S. 162 (2016) ................................................................ 34

*Marx v. Gen. Revenue Corp.,*
  568 U.S. 371 (2013) ................................................................ 30

*MCI Telecommunications Corp. v. Am. Tel. & Tel. Co.,*
  512 U.S. 218 (1994) ................................................................ 24

*Miller Brewing Co. v. G. Heileman Brewing Co., Inc.,*
  561 F.2d 75 (7th Cir. 1977) ................................................... 24

*Pulsifer v. United States,*
  601 U.S. 124 (2024) ................................................................ 32

*S.E.C. v. Straub,*
  921 F. Supp. 2d 244 (S.D.N.Y. 2013) .................................... 35

*United States v. Aleynikov,*
  676 F.3d 71 (2d Cir. 2012) ..................................................... 19

iv

*United States v. Dauray,*
  215 F.3d 257 (2d Cir. 2000) ....................................................... 20, 25

*United States v. Harris,*
  838 F.3d 98 (2d Cir. 2016) ............................................................... 30

*United States v. Hayes,*
  555 U.S. 415 (2009) ........................................................................ 39

*United States v. Kozeny,*
  667 F.3d 122 (2d Cir. 2011) ............................................................ 19

*United States v. Leal-Matos,*
  Crim No. 21-150 (SCC), 2022 WL 476094 (D.P.R. Feb. 15, 2022) ...... 27

*United States v. Persico,*
  645 F.3d 85 (2d Cir. 2011) ............................................................... 19

*United States v. Ritchey,*
  604 F. Supp. 3d 397 (S.D. Miss. 2022) ............................................. 26

*United States v. Temple,*
  447 F.3d 130 (2d Cir. 2006) ............................................................ 19

*United States v. Truman,*
  688 F.3d 129 (2d Cir. 2012) ............................................................ 19

*United States v. Wells,*
  519 U.S. 482 (1997) ........................................................................ 38

*Yazoo & Mississippi Valley R. Co. v. Thomas,*
  132 U.S. 174 (1889) ........................................................................ 35

## STATUTES

18 U.S.C. § 371 ........................................................................ 1, 11

18 U.S.C. § 3402 .......................................................................... 14

50 U.S.C. § 4511 ..................................................................... 3, 4, 5

v

50 U.S.C. § 4512 .............................................................. passim

50 U.S.C. § 4513 ..........................................................................4

## REGULATIONS

85 Fed. Reg. 16227 .....................................................................4

85 Fed. Reg. 17592-01 ............................................... 5, 8, 9, 27

## OTHER AUTHORITIES

A. Scalia & B. Garner, *A Note on the Use of Dictionaries*,
   16 Green Bag 2d 419 (Summer 2013) ...............................................24

A. Scalia & B. Garner,
   Reading Law: The Interpretation of Legal Texts (2012) ....................33

CONF. REP. 81-3042 ................................................................38

H.R. REP. 81-2759 ..................................................................38

Oxford English Dictionary (Second Edition, 1989) ...............................24

Webster's New International Dictionary, Second Edition (1945) ..........24

Webster's Third New International Dictionary (1961) .........................24

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 24-2975

UNITED STATES OF AMERICA,

*Appellee,*

-against-

WILLIAM YOUNG SR., also known as BILL,

*Defendant*

KENT BULLOCH,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

BRIEF FOR THE UNITED STATES

PRELIMINARY STATEMENT

Defendant-Appellant Kent Bulloch appeals from a judgment entered on January 12, 2023, in the United States District Court for the Eastern District of New York (Kuo, M.J.) convicting him, after a jury trial, of conspiracy to violate the Defense Production Act, a misdemeanor in violation of 18 U.S.C. § 371 and 50 U.S.C. § 4512, and sentencing him

2

to two years of probation and a $1,000 fine (A:57)[1]; and from an order entered on November 1, 2024 in the district court (Komitee, J.), affirming the judgment (A:34-56).

Bulloch argues that the evidence at trial was insufficient to convict him of conspiring to "accumulate . . . for the purpose of resale at prices in excess of prevailing market prices," 50 U.S.C. § 4512, certain materials designated by the President as scarce, because the word "accumulate" as used in the statute can only mean "hoard," which necessarily entails (in Bulloch's view) an intention to withhold from the market for some significant period of time.

For the reasons that follow, Bulloch's strained interpretation of the statute is wrong. His arguments should be rejected and his conviction affirmed.

---

[1] "A," "GA," "Br.," and "DE" refer to Bulloch's appendix, the government's appendix, Bulloch's brief, and entries on the district court's docket, respectively.

## STATEMENT OF FACTS

I.     The Defense Production Act of 1950
and the President's Designation of Scarce
Materials in Response to the COVID-19 Pandemic

The Defense Production Act of 1950, 50 U.S.C. §§ 4501 *et seq.* (the "Act"), authorizes the President to, among other things, "allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense." 50 U.S.C. § 4511(a)(2). The President may exercise this authority "to control the general distribution of any material in the civilian market" only if the President finds "(1) that such material is a scarce and critical material essential to the national defense, and (2) that the requirements of the national defense for such material cannot otherwise be met without creating a significant dislocation of the normal distribution of such material in the civilian market to such a degree as to create appreciable hardship." *Id.* § 4511(b).

The Act further provides that "[i]n order to prevent hoarding, no person shall accumulate (1) in excess of the reasonable demands of business, personal, or home consumption, or (2) for the purpose of resale at prices in excess of prevailing market prices, materials which have been

4

designated by the President as scarce materials or materials the supply of which would be threatened by such accumulation." 50 U.S.C. § 4512. A willful violation of this provision is a misdemeanor punishable by up to one year in prison and a $10,000 fine. *Id.* § 4513.

On March 13, 2020, as COVID-19 was spreading rapidly within the United States, the President issued Proclamation 9994 declaring a national emergency. By that time, the disease was threatening to overwhelm hospitals and healthcare providers with rapidly increasing numbers of seriously ill patients while stocks of personal protective equipment ("PPE") and other necessary health and medical resources dwindled. Accordingly, on March 18, 2020, the President issued Executive Order 13909, invoking the powers vested in the President by the Act. *See* 85 Fed. Reg. 16227.

In Executive Order 13909, the President found "that health and medical resources needed to respond to the spread of COVID-19, including personal protective equipment and ventilators, meet the criteria specified in section 101(b) of the Act (50 U.S.C. 4511(b))." 85 Fed. Reg. 16227. The President further delegated authority to the Secretary of the Department of Health and Human Services ("HHS") to "identify

5

additional specific health and medical resources that meet the criteria of section 101(b)." *Id.* On March 25, 2020, the Secretary of HHS exercised that authority by publishing a notice designating certain medical resources under the Act as scarce materials, specifically including "N-95 Filtering Facepiece Respirators" and "Other Filtering Facepiece Respirators." *See* 85 Fed. Reg. 17592-01.

## II. The Offense Conduct

In March and April 2020, as the COVID-19 pandemic ravaged the United States, doctors and nurses and first responders were desperate for PPE masks because so many people were dying. (GA:6). Hospitals in the New York area were "inundated with COVID," and were "set[ting] up external tents to triage the patients" before they entered emergency departments that were already so "full of patients." (GA:46). At this time, the evidence at trial showed, Bulloch saw the emergent national crisis as an opportunity to enrich himself. As he said himself in a recorded telephone call on April 22, 2020,

> what's happening out there is that, I think that people are starting to read the writing on the wall and realizing there's going be a real shortage of masks. They cannot make the number of masks they're going to need, because Americans need to

> get back working and there's just no way, um, the production level is set up for, for you know, one percent of what we're gonna need. So people are starting to realize that there's a real profit to be made, and they're jumping on it so fast, that for us to get in line, what we need is to be able to say, show proof of funds, and then pay the moment the masks arrive.

(GA:76, 81).

To exploit the intense demand for PPE materials, Bulloch sought to insert himself as a middleman and extract profits from public desperation. In short, Bulloch and his co-conspirators solicited buyers and investors who would put up as much money as possible to enable Bulloch to "get in line" to buy PPE masks in bulk—as many as he could secure the money to buy. (GA:81). Buyers or investors would transfer money to Bulloch's attorney trust account, and Bulloch would use the money to arrange the purchase of bulk PPE materials from manufacturers and importers. (GA:5, 81-83). Then Bulloch, co-conspirators, and investors would resell the masks at a substantial markup, with Bulloch keeping a portion of the profits for himself. (GA:14, 96).

Bulloch represented himself as an attorney "paymaster"—that is, in essence, an escrow agent who, because he is an attorney, could make (improper) use of an attorney trust account to facilitate bulk PPE purchases. But emails and recorded phone calls admitted in evidence at trial demonstrated that Bulloch also actively participated in negotiations and pressed potential investors to send him money for masks urgently. In one email, Bulloch represented to a potential buyer that one million KN95 masks and 11 million 3-Ply masks were immediately available in Los Angeles, and Bulloch "highly recommend[ed] placing the total purchase price into escrow" so that the masks would not be sold to others. (GA:67). In a recorded telephone call, Bulloch urged another potential investor to help him "get in line" by putting up money to take possession of masks and complained that other investors were moving too slowly, because "we had two and a half million in a warehouse yesterday, they're sold today." (GA:84).

Bulloch also expressly contemplated his own hands-on involvement in the accumulation and distribution of masks and, in so doing, expressed anxiety about law enforcement attention. In one recorded call, while speaking at length about his intention to receive one

million masks in California and arranging logistics for their transport to New York, Bulloch said,

> when I take possession, I'm gonna have to have, I don't, I'm not gonna leave there until it's ours, just leave it in a warehouse. [Laughs] You know, I'm gonna have . . . to make sure and just so you understand, I'm probably going to have to go there and do this in person because I am so worried about doing any kind of electronic, um, instructions with—and it's not that big of a deal it's a nine hour drive for me—but it's, um, I'm going to make sure that we're not exposing ourselves, uh, to, um, having this stuff taken. I'm going to take care of it personal[ly].

(GA:94). In this same call, Bulloch's co-conspirator Bill Young proposed that he personally transport the masks:

> [W]hat if I got with, with it, I pick them up in California and . . . I don't have to use a, uh, tractor trailer truck, I could just haul them over in a box truck.

(GA:91). Bulloch responded by expressing his concern that the masks could be seized by the federal government if "the truck got taken in Missouri, or whatever— . . . in the middle." (*Id.*).

One potential investor with whom Bulloch and his co-conspirators spoke was in fact an undercover agent (the "Undercover") of the Federal Bureau of Investigation, who made the recordings of

Bulloch's calls that were played at trial and testified about them. As the Undercover testified at trial, and as demonstrated in recorded calls, the Undercover told Bulloch that he wanted to purchase one million KN95 masks through Bulloch and then resell them at a 50% markup, for $5.70 each. (GA:18-19, 84-86). Bulloch readily agreed to take 10% of the Undercover's expected profits in exchange for letting the Undercover's putative buyers make payments to the Undercover through Bulloch's attorney trust account. (GA:83-87). Bulloch himself proposed to the Undercover that rather than distributing the profits immediately, they simply roll over the profits into the next purchase of masks to repeat the cycle. (*Id.*; GA:20). Bulloch expressed concern that if each cycle of buying and selling masks took too long, they would not "get a lot of, a lot of cycles in" while the opportunity still existed (GA:25, 98)—because, naturally, the crisis would not last forever.

In furtherance of the transaction, the Undercover asked Bulloch for a letter that would conceal the price gouging by falsely representing to buyers that the masks were marked up by a far smaller amount, to avoid presenting a "red flag" to potential buyers. (GA:20-22, 87, 95-97). Bulloch readily agreed, and he told the Undercover on a

10

recorded call that "we don't want any red flags for you, because the truth is that, um, any red flags for you would be red flags for us. . . . So, um, and I don't look good in orange. I got nice pinkish skin. [Laughs] I don't need the—I don't need orange to clash with it." (GA:23-24, 96-97). In fact, Bulloch suggested to the Undercover that they make false invoices with a more modest lie that would be more believable. (GA:88) ("we can make up invoices and send you invoices, just, but, I mean, ten cents [of markup per mask] is probably, you should probably do, be doing like twenty-one cents or something like that"). Bulloch also suggested that the profit-sharing agreement among the co-conspirators be described in terms of percentages rather than specific dollar amounts so that if the Undercover "gets raided," law enforcement agents would not find "two documents that contradict each other." (GA:22, 93).

After that call, on April 22, 2020, Bulloch sent the Undercover a purported "escrow agreement" on Bulloch's law-firm letterhead, which contained a provision that the "Client"—defined as the Undercover— would not "charge more than 10% above costs to secondary buyer" of the masks. (GA:68-73). This purported agreement represented an effort by Bulloch to assist the Undercover by falsely claiming to potential buyers

11

that the masks were not resold at more than a 10% markup. (GA:29-31).

The next day, Bulloch signed the fraudulent agreement and emailed an

image of the signature block to the Undercover. (GA:74-75).

III.   Proceedings in the District Court

On April 27, 2020, Bulloch was arrested in California

pursuant to an arrest warrant and complaint signed that same day in the

Eastern District of New York. (*See* DE:1). A few weeks later, on May 18,

2020, Bulloch was charged by information with a single count of

conspiracy to violate the Defense Production Act, in violation of 18 U.S.C.

§ 371 and 50 U.S.C. §§ 4512 and 4513, by agreeing with others to

accumulate for purposes of resale at prices in excess of prevailing market

prices certain PPE, including face masks, which had been designated as

scarce materials by the President pursuant to the Defense Production

Act.[2] (DE:8).

_____

[2]     Although the information includes a header that describes the charge as "Price Gouging Conspiracy," Bulloch objected to the use of the words "price gouging" in the jury instructions because those words do not appear in the statutory text. Accordingly, the charge was described at trial with the language that follows that descriptive header, and the phrase "price gouging" was not mentioned as part of the court's jury instructions.

12

Before trial, Bulloch objected to the proposed jury instruction that the word "accumulate" for purposes of the charged offense "is used in the ordinary sense and simply means to gather, collect, or accrue." (DE:44 at 13). Bulloch requested instead that the jury be instructed that:

> "Accumulate" means to gather, collect, or accrue over a period of time. To establish this element in a prosecution under the statute that prohibits hoarding scarce materials, the government must establish that the defendant's accumulation of materials caused them to be withheld from the market for a period of time long enough to cause or allow their price to rise.

(*Id.*). Bulloch further requested that the jury be instructed that

> the government must prove that the defendant anticipated that the price of the materials would increase during the time he withheld them from the market and he specifically intended to take advantage of that increase by later selling them at a price in excess of the market prices that prevailed at the time he began accumulating the materials.

(*Id.* at 14). U.S. Magistrate Judge Peggy Kuo rejected those requests. (*See* DE:68).

Bulloch then moved to dismiss the charging instrument on the basis that the statute is (in his view) unconstitutionally vague as applied, in light of the intended jury instructions. (*See* DE:55). In a reasoned

13

opinion and order, Judge Kuo rejected Bulloch's "novel" argument regarding the meaning of the word "accumulate" (DE:64 at 7), and denied his motion to dismiss (*id*. at 12-13).

Bulloch was tried before a jury from July 20 to July 22, 2022, with Magistrate Judge Kuo presiding. At trial, the government called three witnesses. First, the Undercover—who testified under the alias Ryan Russo, which he had used in his communications with Bulloch—testified about Bulloch's scheme to accumulate millions of face masks for the purpose of reselling them at a significant markup. The government also introduced the recorded telephone calls and Bulloch's emails as part of the Undercover's testimony. (GA:2-45). Second, Thomas Anderson, the director of supply chain for a three-hospital healthcare system north of New York City, testified about the conditions hospitals faced in March and April 2020, his own efforts during that time to obtain PPE such as face masks, and the prices his hospitals paid for them. Anderson testified that, in March and April 2020, his three-hospital system paid, on average, approximately 82 cents per N95 mask and 14 cents per 3-Ply mask. (GA:46-47, 52). Third, Dr. Anupam Jena, a medical doctor and Ph.D. economist who teaches at Harvard Medical School and sees

14

patients at Massachusetts General Hospital, testified as an expert witness in medical economics. Based on his economic analysis of aggregate purchase data from thousands of hospitals nationwide and data from one of the biggest hospitals in New York City, Dr. Jena opined that the prevailing market price of N95 masks in the relevant period was between 50 cents and one dollar per mask, which should represent an upper bound for KN95 prices, and that the prevailing market price of 3-Ply masks was approximately 5 to 10 cents per mask. (GA:54-61).

Following the government's presentation of evidence, the court denied Bulloch's motions for a judgment of acquittal. (GA:63). The jury returned a guilty verdict on July 22, 2022. (GA:64-66; DE:70).

On January 12, 2023, Judge Kuo sentenced Bulloch to two years of probation and a $1,000 fine. (A:57-60).

IV.   Appeal to a District Judge and Affirmance

On January 26, 2023, Bulloch filed a notice of appeal to a United States District Judge, pursuant to 18 U.S.C. § 3402 and Rule 58(g)(2)(B) of the Federal Rules of Criminal Procedure. (*See* A:62). In that first appeal of his conviction, Bulloch argued that Judge Kuo erred by rejecting his proposed jury instructions (and the evidence was

15

insufficient for a correctly instructed jury to convict him), and that, to the extent that she did not err, the statute was unconstitutionally vague as applied to him. (*See* DE:91). Distilled to their essence, his arguments in that first appeal were the same as the one he raises now in the present appeal: that the word "accumulate" as used in the Act is a synonym of the word "hoard" and necessarily entails an intent to withhold materials from the market for some significant period while anticipating that prices will rise. He thus argued that the trial evidence was insufficient to convict him because, although the evidence clearly showed that he conspired to accumulate millions of face masks and to resell them at prices in excess of prevailing market prices, it also showed that he intended to do so rapidly and not withhold an inventory of masks from the market.

On November 1, 2024, United States District Judge Eric Komitee issued a memorandum and order affirming Bulloch's conviction and rejecting Bulloch's arguments. (A:34-56). As the district court held, "none of the plain language of Section 4512, the broader context in which it appears, or the [Defense Production Act]'s statutory history supports Bulloch's reading of 'accumulate.'" (A:50).

16

This appeal followed.

17

## SUMMARY OF ARGUMENT

The district court properly instructed the jury that, for purposes of the charged offense in 50 U.S.C. § 4512, "'[a]ccumulate' is used in the ordinary sense and simply means to gather, collect, or accrue." (DE:68 at 23). This instruction is consistent with the plain and unambiguous meaning of the word "accumulate."

Bulloch's arguments are premised on an erroneous reading of 50 U.S.C. § 4512. He interprets "accumulate" to mean "hoard," and he opines that hoarding scarce materials necessarily entails withholding them from the market for some substantial period of time. Thus, Bulloch argues that the evidence at trial was insufficient to convict him of conspiring to accumulate face masks for the purpose of reselling them at supra-market prices, because it did not show that he intended to *withhold* the masks from the market for any significant period of time.[3]

Bulloch's interpretation of the statute is at odds with its plain text, creates impermissible surplusage, violates the canon of meaningful

---

[3] Bulloch does *not* contend that the evidence was insufficient to convict him if "accumulate" just means "to gather, collect, or accrue," as the jury was instructed, and the evidence clearly was sufficient to convict him in that case.

18

variation, and defies the Supreme Court's guidance on the interpretation of prefatory clauses. Finally, because Bulloch identifies no ambiguity and the statute's prohibition is clear, his resort to the rule of lenity should be rejected. In sum, all of Bulloch's arguments fail, and his conviction should be affirmed.

## ARGUMENT

## BULLOCH'S CONVICTION SHOULD BE AFFIRMED

I.     Standard of Review

Preserved challenges to the sufficiency of the evidence are reviewed de novo, *United States v. Truman*, 688 F.3d 129, 139 (2d Cir. 2012), viewing the evidence "in conjunction, not in isolation," *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011), and in the light most favorable to the government, *United States v. Temple*, 447 F.3d 130, 136-37 (2d Cir. 2006).  Thus, "[a] defendant challenging the sufficiency of the evidence bears a heavy burden." *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011).

Preserved claims regarding the interpretation of a federal statute are also reviewed de novo.  *United States v. Aleynikov*, 676 F.3d 71, 76 (2d Cir. 2012).

II.     The Act Unambiguously Proscribes Bulloch's Conduct

The language of 50 U.S.C. § 4512 is clear and unambiguous, and the jury was properly instructed that that the word "'[a]ccumulate' is used in the ordinary sense and simply means to gather, collect, or accrue."  (DE:68 at 23).  Bulloch's alternative reading of the Act—

20

according to which "accumulate" means "hoard"—runs contrary to the plain meaning of the statutory text, creates impermissible surplusage, violates the canon of meaningful variation, and defies the Supreme Court's guidance on the interpretation of prefatory clauses. Additionally, although legislative history need not be addressed, Bulloch misconstrues it. Because the meaning of the statute is clear and its prohibition clearly proscribes Bulloch's conduct, the rule of lenity has no application.

A.      Bulloch's Strained Interpretation of
          the Statute Rejects Its Plain Meaning

When interpreting a statute, a court should first analyze the plain meaning of the text. *United States v. Dauray*, 215 F.3d 257, 260 (2d Cir. 2000). If the meaning is plain, the inquiry ends there. *Daniel v. Am. Bd. of Emergency Medicine*, 428 F.3d 408, 423 (2d Cir. 2005) ("If the meaning is plain, we inquire no further."). More specifically, it is the consideration of "the ordinary, common-sense meaning of the words" that is the first step in understanding the plain meaning of a statute. *Dauray*, 215 F.3d at 260.

Here, Section 4512 reads, in relevant part:

In order to prevent hoarding, no person shall accumulate (1) in excess of the reasonable

21

> demands of business, personal, or home consumption, or (2) for the purpose of resale at prices in excess of prevailing market prices, materials which have been designated by the President as scarce materials or materials the supply of which would be threatened by such accumulation.

50 U.S.C. § 4512. By a plain reading, this statute contains a prefatory clause ("[i]n order to prevent hording"), an operative clause ("no person shall accumulate . . . materials," that meet at least one of two conditions as designated by the President), and two enumerated alternative elements separated by "or." Because "or" separates these alternative elements, the statute effectively defines two crimes, provable through distinct elements: the statute can be violated by accumulating designated scarce materials *either* (1) "in excess of the reasonable demands of business, personal, or home consumption" *or* (2) "for the purpose of resale at prices in excess of prevailing market prices." *Id.* Only the latter was charged as the object of the conspiracy in this case.

Bulloch's entire argument turns on his dramatically unidiomatic assertion that the word "accumulate" is "a synonym, or a virtual synonym, for 'hoarding.'" (Br. 16). This argument requires him to stretch the plain meaning of "accumulate" to describe only a process

22

that occurs over some unclear but apparently lengthy period of time—and in the context of the statute, he contends it would necessarily entail (as he asked Judge Kuo to instruct the jury) a deliberate effort to withhold materials from the market with the expectation that prices will rise. Of course, one may accumulate something over a long period of time, but no particular period necessarily inheres to the word, and the notion of an effort to withhold materials from the market is invented from whole cloth. That is simply not anywhere in the statute.

It is certainly true that "accumulate" can carry a temporal connotation, because it is a verb that denotes an act that occurs in time. But as Judge Komitee observed in his opinion affirming the judgment, "it would make equal sense to describe a reservoir as accumulating raindrops over five years, and an awning as accumulating them over five seconds." (A:40). Bulloch cites an English-learner's dictionary[4] that offers the definition "to collect a large number of things over a long period of time" (Br. 19), but his reliance on this definition misunderstands what

---

[4] Bulloch attributes this definition to the Cambridge Dictionary of American English; but at the URL he provides, it is cited as the Cambridge Advanced Learner's Dictionary & Thesaurus.

23

dictionary definitions do. Of course it is true that someone who collects a large number of things over a long period of time accumulates them, and this definition (especially when presented among others) therefore may be useful to someone who encounters the word as an unfamiliar one in a particular context. But it does not follow, and no dictionary would purport, that every time someone accumulates something the quantity must be large or the duration long. To the contrary, it is perfectly idiomatic English to refer to accumulating only a small quantity, or rapidly accumulating. Indeed, Bulloch actually cites a second dictionary (*Id*. (citing www.dictionary.com)) that undermines the argument that an extended temporal element inheres in "accumulate" because it defines the word as meaning "to gather or collect, *often* in gradual degrees" (emphasis added). This necessarily implies that some instances of gathering or collecting that are *not* in gradual degrees are nevertheless instances of accumulating.

Indeed, many definitions of "accumulate" omit a time element altogether, sometimes interpreting the word in terms of the volume of

materials amassed. The widely favored[5] Webster's New International Dictionary, Second Edition (1945) defines "accumulate" as "[t]o heap up in a mass; to pile up; hence, to collect or bring together; to amass." Webster's Third New International Dictionary (1961) simplifies the definition as "to heap up in a mass: pile up . . . : amass . . . : collect, gather." The authoritative[6] Oxford English Dictionary (Second Edition, 1989) offers an almost identical definition—"To heap up in a mass, to pile up; to amass or collect."—and explains that the word's etymology is derived from the Latin "cumulus," which means "a heap."

In sum, although the word "accumulate" sometimes describes a process that occurs over an extended period—after all, creating a "heap"

---

[5] Expressions of favor for "Webster's Second" have often appeared as criticisms of its successor. *See, e.g.*, *Miller Brewing Co. v. G. Heileman Brewing Co., Inc.*, 561 F.2d 75, 80 (7th Cir. 1977) (discussing, after a definition from the Third Edition, "[t]he comparable definition in the previous, *and for many the classic*, edition of the same dictionary" (emphasis added)); *MCI Telecommunications Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 228 n.3 (1994) (collecting citations of criticisms of "Webster's Third" that broadly favor its predecessor).

[6] *See, e.g.*, A. Scalia & B. Garner, *A Note on the Use of Dictionaries*, 16 Green Bag 2d 419, 423 (Summer 2013) ("Historical dictionaries, such as *The Oxford English Dictionary* . . . are the most reliable sources for historical terms.").

25

sometimes takes a while—sometimes it does not. And, as Judge Kuo and Judge Komitee both rightly recognized, a sudden accumulation is a perfectly comprehensible concept expressed in ordinary English. Judge Kuo's instruction to the jury in this case did not put a finger on the scale: rather, it merely provided that, "'[a]ccumulate' is used in the ordinary sense and simply means to gather, collect, or accrue." (DE:68 at 23). This definition is accurate and represents a fair through-line of the above definitions. It can naturally be understood with implicit temporality, as gathering or collecting or accruing can occur over a period of time, and it fairly declines to impose any specific arbitrary period or a requirement of a more substantial length of time. Moreover, it expressly invokes "the ordinary sense" of the word, in reliance on the jury's understanding, which is consistent with this Court's guidance that considering "the ordinary, common-sense meaning of the words" is the first step in understanding the plain meaning of a statute. *Dauray*, 215 F.3d at 260.

By contrast, Bulloch's view that the statute's use of the word "accumulate" necessarily entails withholding materials from the market for some period of time represents a rejection of the plain text. The

26

element of withholding from the market is simply made up and appears nowhere in the statute.

Bulloch's argument fares no better simply because "hoarding" is sometimes described as "accumulating." Indeed, his argument glosses over the fact that one thing can be a subset of, and not coextensive with, another. For instance, Bulloch quotes a newspaper article from 1950 that refers to "hoarders" who were jailed in Hungary for "accumulat[ing]" food stocks during a shortage, and he concludes that "accumulate" and "hoard" mean the same thing. (Br. 17 n.7). He evidently fails to recognize that, in ordinary usage, all hoarders accumulate something but not everyone who accumulates something hoards. This logical blind spot results in Bulloch's cramped construal of the word "accumulate."

With similar reasoning, Bulloch cites *dicta* from two district courts and a notice published by the Secretary of Health and Human Services that used the word "hoarding" in place of "accumulating" when paraphrasing the statute—although the distinction between the two separate ways of violating the statute was not at issue in any of them— and he suggests that this shows the words are "interchangeable." (Br. 16–19, citing *United States v. Ritchey*, 604 F. Supp. 3d 397, 406 (S.D.

27

Miss. 2022), *United States v. Leal-Matos*, Crim No. 21-150 (SCC), 2022 WL 476094, at *1 (D.P.R. Feb. 15, 2022), and 85 Fed. Reg. 17592-01)). But it does not follow from the fact of *overlapping* meanings, which can justify sometimes using one word in place of the other, that two words are synonyms.

As noted above, the statute prohibits accumulating scarce materials when *either* of two additional elements are met: the accumulation is "(1) in excess of the reasonable demands of business, personal, or home consumption, *or* (2) for the purpose of resale at prices in excess of prevailing market prices." 50 U.S.C. § 4512 (emphasis added). In other words, as Judge Komitee paraphrased it, the statute prohibits accumulating scarce materials "(1) to an unreasonable extent, or (2) for an impermissible purpose." (A:50). Conduct that violates the statute by the first provision (*i.e.*, accumulating scarce materials to an unreasonable extent) may or may not also violate it by the second (*i.e.*, accumulating scarce materials for an impermissible purpose). The first, in isolation, fits the idiomatic use of the word "hoarding," and the second, in isolation, does not; but because some conduct violates both provisions,

28

it is unsurprising for the word "hoard" to sometimes be used when the distinction between the two provisions is not at issue.

B.      Bulloch's Strained Interpretation of the Statute Creates Surplusage and Violates the Canon of Meaningful Variation

As discussed above, 50 U.S.C. § 4512 defines two distinct crimes, only the latter of which was charged as the object of the conspiracy in this case: the statute can be violated by accumulating designated scarce materials *either* (1) "in excess of the reasonable demands of business, personal, or home consumption, *or* (2) for the purpose of resale at prices in excess of prevailing market prices."  50 U.S.C. § 4512 (emphasis added).

As Bulloch points out (Br. 22), the government has previously referred to the first of these alternatives as the "Hoarding Clause" (or provision) and the latter as the "Price Gouging Clause" (or provision). Whether one adopts these descriptors is immaterial, however, because the two different means of violating the statute are so clear, whatever one calls them.  Bulloch contorts the government's articulation of this plain interpretation by asserting that the government's view ascribes two different meanings to the single use of the word "accumulate," which

would "defy logic." (Br. 22–23). That is false. Accumulate means accumulate. The statute uses that verb once, in its ordinary sense, to prohibit two conceptually distinguishable acts of accumulating scarce materials: to a particular degree ("in excess of the reasonable demands of business, personal or home consumption"), which is irrespective of purpose; and for a particular purpose ("for the purpose of resale at prices in excess of prevailing market prices"), which is irrespective of degree.

Bulloch's view that "accumulate" is an interchangeable synonym of "hoard" in its ordinary sense reads the second of these statutory proscriptions out of the law entirely. If one adopts this understanding of the word "accumulate" and accepts that anyone who "accumulates" scarce materials within the contemplation of the statute necessarily "hoards" them in the sense of withholding a stockpile of them from the market, then every violation of the statute *ipso facto* is a violation of the "in excess of the reasonable demands of business, personal, or home consumption" provision. There is nothing left for the second, separately enumerated prohibition to do.

In other words, the parties agree that hoarding designated scarce materials, for whatever reason (or for no reason at all), violates

30

the statute through the "in excess of the reasonable demands" clause. If, as Bulloch argues, that is the *only* thing the statute prohibits, then there is no reason for the statute to include language regarding "the purpose of resale at prices in excess of prevailing market prices." By Bulloch's interpretation of the scope of the statute, it should simply read, "no person shall hoard in excess of the reasonable demands of business, personal, or home consumption materials which have been designated by the President as scarce materials." But that is not what the statute says.

Bulloch's interpretation—apart from reflecting a cramped understanding of the common verb "accumulate"—thus violates the long-standing canon of statutory construction that statutes should be read to prevent surplusage. It is well-settled law that courts should interpret statutes "so that no [provision] will be inoperative or superfluous, void or insignificant." *United States v. Harris*, 838 F.3d 98, 106 (2d Cir. 2016) (citing *Corley v. United States*, 556 U.S. 303 (2009)). Statutory interpretation should give "effect to every clause and word of a statute." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013). The natural reading of the statute, in stark contrast to Bulloch's, gives effect to both statutory prohibitions: a person who accumulates scarce materials to an

31

unlawful degree (in excess of reasonable demands of business, etc.) may or may not also be doing so for an unlawful purpose (resale in excess of prevailing market prices), and vice versa. These are distinct prohibitions that may or may not both apply in a particular case.

Bulloch's analogous argument that Congress could have but did not criminalize price gouging directly by prohibiting sale of scarce materials at above-market prices, or something similar (Br. 23-24), is an attack on a strawman. Of course, this statute is not that hypothetical one, which would criminalize overlapping but also different conduct. Congress might reasonably wish *not* to prohibit the sale (even if motivated by the ability to charge above-market prices) of preexisting stockpiles of now-scarce materials, or of scarce materials newly manufactured to meet sudden demand, because such conduct could serve the public interest in increasing the supply of scarce materials on the market. Congress could thus choose instead to prohibit the act of accumulating such materials for the purpose of resale at above-market prices—in other words, the act of inserting oneself as an unnecessary middleman to extract windfall profits at a desperate public's expense, as Bulloch conspired to do.

32

Additionally, Bulloch's argument violates the canon of meaningful variation. "In a given statute, the same term usually has the same meaning and different terms usually have different meanings." *Pulsifer v. United States*, 601 U.S. 124, 149 (2024). By Bulloch's interpretation, however, the statute at issue here uses the word "hoarding" (in its prefatory clause) and the word "accumulate" (in its operative clause)—two different words in the very same sentence—to mean precisely the same thing. As Judge Komitee noted, "[h]e never explains why Congress would have made that strange semantic choice." (A:43). If the statute prohibited only hoarding scarce materials and withholding them from the market, Congress would have said that.

C. Bulloch's Argument Defies Supreme
Court Guidance on Prefatory Clauses

Bulloch's argument that the statute only prohibits hoarding and that the word "accumulate" should be read as interchangeable with "hoard" also relies on his view that the meaning of the operative clause ("no person shall accumulate . . .") must be understood through the

context of the prefatory clause ("In order to prevent hoarding . . .").[7] Bulloch is mistaken, and his preferred interpretation defies the Supreme Court's clear teaching about the proper interpretation of prefatory clauses.

Prefatory clauses can declare statutory purposes, but they can neither limit nor expand a statute's operative clause. *District of Columbia v. Heller*, 554 U.S. 570, 577-78 (2008). In *Heller*, the Supreme Court held that the prefatory clause of the Second Amendment, which announces the purpose of preserving "a well-regulated Militia," did not limit the operative clause's guarantee of private gun ownership for other purposes. "The Second Amendment is . . . divided into two parts: its prefatory clause and its operative clause. The former does not limit the latter grammatically, but rather announces a purpose." *Heller*, 554 U.S. at 577. Although a logical connection must exist between the two clauses,

---

[7] Bulloch identifies this principle with the canon of *noscitur a sociis* (Br. 15, 21), but that canon generally applies to words grouped in lists, and it counsels that "words grouped in a list should be given related meanings." A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts § 31, p. 195 (2012) (internal quotation marks omitted). There is no list at issue here, and Bulloch's argument is really a more general one about reading words in context.

34

and the prefatory clause may provide some clarification to resolve an ambiguity in the operative clause (to the extent there is one), the "prefatory clause does not limit or expand the scope of the operative clause." *Id.* at 578. As the Supreme Court ruled in *Heller*, the operative clause can and does serve the purpose of allowing the maintenance of a well-regulated militia while also—even in cases unrelated to the militia—guaranteeing private, individual firearm ownership. That is, the operative clause can have (and, in the Second Amendment, the Supreme Court held that the operative clause does have) a broader scope than the purpose announced in the prefatory clause.

Indeed, "[t]he prefatory clause does not suggest" the only, or even necessarily the most important, reason for the operative clause, as most Americans "undoubtedly thought [the right to bear arms] even more important for self-defense and hunting." *Id.* at 599. The operative clause is not narrowed by the prefatory clause. "It is nothing unusual in acts . . . for the enacting part to go beyond the preamble; the remedy often extends beyond the particular act or mischief which first suggested the necessity of the law." *Id.* at 577-78 (internal quotation marks and citation omitted); *see also Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 173

35

(2016) ("But the prefatory clause has no bearing on whether § 8127(d)'s requirement is mandatory or discretionary. The clause announces an objective that Congress hoped that the Department would achieve and charges the Secretary with setting annual benchmarks, but it does not change the plain meaning of the operative clause, § 8127(d)."); *Yazoo & Mississippi Valley R. Co. v. Thomas*, 132 U.S. 174, 188 (1889) (explaining that prefatory clauses or preambles cannot change the scope of the operative clause); *S.E.C. v. Straub*, 921 F. Supp. 2d 244, 260-61 (S.D.N.Y. 2013) ("Defendants conflate § 2462's operative language . . . with the provision's *statement of purpose . . . .*") (citing *Heller*).

Bulloch nominally concedes that the prefatory clause cannot limit the scope of the operative clause—because he must concede that— yet he argues nevertheless that the prefatory clause "informs the *meaning* of the word on which its operative clause hinges." (Br. 21). But that is a distinction without a difference. Bulloch's argument is unmistakenly that the prefatory clause "informs" the meaning of the statute by *limiting* the meaning of the statute. And that argument is a total rejection of the law on prefatory clauses.

36

To the contrary, the prefatory clause here announces that the prevention of hoarding is a reason for codifying the statute, and the operative clauses clearly prohibit more (and more specific) conduct than merely hoarding. Just as the Supreme Court has ruled that the right to bear arms is broader than the purpose of preserving a "well[-]regulated [m]ilitia," so also is the prohibitory scope of 50 U.S.C. § 4512 broader than the purpose of preventing hoarding in a time of crisis. The statute's prohibition of accumulating scarce materials for purposes of resale at above-market prices does in fact serve the goal of preventing hoarding, because the inflationary cost effects of such conduct may incentivize hoarding (among price gougers and others). Therefore, a Congress principally concerned with preventing hoarding could rationally prohibit both categories of conduct as a means to the same end. Even if that were not the case, however, the statute's operative language would not be limited by the prefatory clause and for the reasons described above, the operative language clearly is not limited to a prohibition on hoarding and withholding scarce materials from the market.

37

D.    Bulloch Misconstrues the Statute's Legislative History

Because the statute is unambiguous, there is no need to address legislative history.  *Daniel*, 428 F.3d at 423 ("Only if we discern ambiguity do we resort first to canons of statutory construction, and, if the meaning remains ambiguous, to legislative history." (internal citation omitted)).  Nevertheless, Bulloch's interpretation of the relevant legislative history is erroneous.

As an initial point, Bulloch's invocation of the (defunct) Lever Act, and his speculation that the legislators who enacted the Defense Production Act "were likely to have had [the Lever Act's] definition in mind" (Br. 26), should be rejected out of hand.  The Lever Act is no longer law, let alone the law Bulloch was convicted of conspiring to violate.  The jury that convicted him was appropriately instructed on the charged crime, and not on a definition of hoarding contained in a law that has been defunct for over 100 years.  If Congress indeed had that statute's definitions in mind when enacting this one, it could have clearly adapted those definitions, but Congress did not do so.[8]

---

[8]    Indeed, as Judge Komitee observed when rejecting Bulloch's argument, if the Lever Act is regarded as a predecessor to the Defense

More generally, the legislative history of the Defense Production Act indicates a broader intended scope than merely prohibiting hoarding, with both the House and Conference Reports suggesting the prevention of excessive prices as among the purposes of the law. The House Report expressed concern about Congress doing "what [it] can to allay the fear which causes panic buying, and [the government] should at the same time be prepared to discipline those who are trying to take advantage of that fear." H.R. REP. 81-2759 at 3623. Similarly, the conference report repeated the House Report's declaration of purpose and included "regulat[ing] speculation on commodity exchanges" as an authorized action within that purpose. CONF. REP. 81-3042 at 3645. The Conference Report further reflected an interest in price stabilization when the "price of the material or service has risen or threatens to rise unreasonably above the price prevailing during the period [of emergency]" or when, "the price increase will materially affect

---

Production Act, the very fact that Congress *did not* carry over the definition Bulloch cites strongly suggests that it was deliberately dropped. (A:48-50 (citing *United States v. Wells*, 519 U.S. 482 (1997) for the proposition that the "most likely inference" from the omission of a term in a successor statute is intentional exclusion to change meaning)).

39

the cost of living or the national defense." *Id*. at 3649. Thus, Congress signaled its intent to address the issue of excessive prices for scarce materials. In short, Bulloch's view that the statute serves *only* to prohibit hoarding and withholding scarce materials from the market is mistaken. The statute reaches more than that.

E. The Statute Is Unambiguous and
the Rule of Lenity Does Not Apply

Finally, Bulloch argues that, even if he is wrong about the meaning of "accumulate," the statute is so ambiguous that "a person of ordinary intelligence" could reasonably believe it does not extend to conduct like Bulloch's and his conviction should therefore be reversed under the rule of lenity. (Br. 29-30). But the rule of lenity applies "only when, after consulting traditional canons of statutory construction, [courts] are left with an ambiguous statute." *United States v. Hayes*, 555 U.S. 415, 429 (2009) (rejecting application of the rule of lenity where a statute was "not a model of the careful drafter's art" but was nevertheless not "grievously ambiguous" (brackets omitted)). The preceding analysis thus forecloses its application.

As discussed at length above, the operative language of the statute, as relevant here, is clear and unambiguous: "no person shall accumulate . . . for the purpose of resale at prices in excess of prevailing market prices, materials which have been designated by the President as scarce materials . . . ." 50 U.S.C. § 4512. Bulloch suggests that a person of ordinary intelligence might think the context of the prefatory clause's reference to "hoarding" confines the meaning of the operative language, but the mere fact that operative language is preceded by a prefatory clause declaring a statutory purpose does not render the operative language less clear. Indeed, a clear prohibition is easily understood by a person of ordinary intelligence, regardless of the announcement of a broader purpose in a prefatory clause. For instance, a child who is told that "in order to prevent rodents, no one may eat in the bedroom" will surely not be sincerely confused to think that only rodents are prohibited from eating in the bedroom while children are free to do so, or that children may eat in the bedroom so long as they avoid leaving crumbs. The prohibition is clear and unambiguous, and the prefatory clause announcing a purpose neither limits the scope of the prohibited conduct nor renders the prohibition confusing. By the same reasoning, the

41

presence of the prefatory clause "in order to prevent hoarding" will not lead any reasonable person to believe that the prohibition applies only to "hoarders," and no reasonable person would deduce that it is in fact permissible to "accumulate . . . for the purpose of resale at prices in excess of prevailing market prices, materials which have been designated by the President as scarce materials"—in direct defiance of the plain language of the statute—so long as the scarce materials are not withheld from the market for too long. Bulloch's bare and self-serving assertion to the contrary is baseless.

Nor does any theoretical uncertainty about the breadth of possible uses of the word "accumulate" inject any significant ambiguity. "Accumulate," as discussed at length above and as the jury was instructed, is an ordinary word used in its ordinary sense. And although the Supreme Court has observed that "we can never expect mathematical certainty from our language," *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972), hypothetical questions at the margins do not result in statutory infirmity. Taking possession of a million masks and personally arranging their transport across the country—as Bulloch expressly conspired to do in recorded telephone calls that were admitted in

evidence and played at trial, as described above—is a clear example of accumulating masks, even without plans to repeat this process serially to accumulate even more on a rolling basis, as Bulloch also expressly conspired to do in the recorded telephone calls.

Indeed, in addition to showing that Bulloch was directly and intimately involved in planning transactions in millions of masks, including the details of physical custody and transport, the recordings are also replete with references to government enforcement actions and other indicia of consciousness of guilt. Bulloch was explicitly concerned about law enforcement, and the risks posed by creating "red flags." For instance, when the Undercover asked Bulloch for a fraudulent document to misrepresent his intended markup to eventual buyers, Bulloch agreed without hesitation and explained that "any red flags for you would be red flags for us . . . and I don't look good in orange"—what the jury could reasonably interpret to refer to orange prison uniforms. (GA:96-97).

Whatever hypothetical uncertainty one might conjure about non-standard or edge usages of the word "accumulate," the conduct contemplated in these recorded statements falls squarely within the ordinary usage and plain meaning of that word. A person who loads, or

directs others to load, a million masks into a box truck knows that he has accumulated a million masks when that process is complete, however quickly it is completed.

In short, the statute is not ambiguous, and Bulloch's recorded statements make clear that he joined a conspiracy to commit conduct at the core of the statute's prohibition. Moreover, Bulloch's recorded statements show his concern with evading detection and avoiding "red flags," which reflect a keen awareness of the potential for legal consequences for such conduct. As the Supreme Court has observed, there is no unfairness in the requirement "that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." *Boyce Motor Lines v. United States*, 342 U.S. 337, 340 (1952). Bulloch did cross the line, as the jury concluded, and he was rightfully convicted. As Judge Komitee reasoned when rejecting Bulloch's constitutional vagueness argument, "Bulloch is effectively arguing that a reader of ordinary intelligence would read Section 4512 as incorporating a temporal requirement that (1) does not inhere in the ordinary meaning of 'accumulate' and (2) never appears in the statutory text itself. This argument strains plausibility." (A:52).

44

In sum, Bulloch is wrong about the unambiguous meaning of the statute, which squarely reaches his conduct, and he has not identified any infirmity in his conviction. The evidence at trial was sufficient to convict him of conspiring to violate the Act, and the judgment of his conviction should be affirmed.

45

## CONCLUSION

For the reasons stated above, the judgment of conviction should be affirmed.

Dated:    Brooklyn, New York
          May 23, 2025

                        Respectfully submitted,

                        JOSEPH NOCELLA, JR.,
                        *United States Attorney*
                        *Eastern District of New York.*

            By:   /s/ ROBERT M. POLLACK
                  ROBERT M. POLLACK
                  Assistant U.S. Attorney


MICHAEL W. GIBALDI,
ROBERT M. POLLACK,
*Assistant United States Attorneys*,
    (*Of Counsel*).

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Second Circuit Rule 32.1(a)(4) because the brief contains 8,270 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated:   Brooklyn, New York
             May 23, 2025

/s/ MICHAEL W. GIBALDI
MICHAEL W. GIBALDI
Assistant U.S. Attorney

A P P E N D I X

TABLE OF CONTENTS

Page

Trial Transcripts,
   *United States v. Bulloch*, No. 20-CR-181 (PK)
   July 21, 2022 ............................................................... GA1
   July 22, 2022................................................................ GA62

Government Exhibits,
   *United States v. Bulloch*, No. 20-CR-181 (PK)
   GX4...................................................................... GA67
   GX13..................................................................... GA68
   GX13A ................................................................... GA69
   GX18..................................................................... GA74
   GX102T.................................................................. GA76

59

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------x

                                        20-CR-181(PK)

UNITED STATES OF AMERICA,

                                        United States Courthouse
        Plaintiff,                      Brooklyn, New York

        -against-                       July 21, 2022
                                        9:00 a.m.
KENT BULLOCH,

        Defendant.

---------------------------------x

            TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
               BEFORE THE HONORABLE PEGGY KUO
               UNITED STATES MAGISTRATE JUDGE
                       BEFORE A JURY


APPEARANCES

For the Government:        UNITED STATES ATTORNEY'S OFFICE
                           Eastern District of New York
                           271 Cadman Plaza East
                           Brooklyn, New York 11201
                           BY:  ROBERT MARSHAL POLLACK, ESQ.
                                HIRAL D. MEHTA , ESQ.
                           Assistant United States Attorneys


For the Defendant:         JEREMY L. GUTMAN, ESQ.
                           521 Fifth Avenue – 17th Floor
                           New York, New York 10175


Court Reporter:            LINDA D. DANELCZYK, RPR, CSR, CCR
                           Phone:  718-613-2330
                           Fax:    718-804-2712
                           Email:  LindaDan226@gmail.com


Proceedings recorded by mechanical stenography.  Transcript
produced by computer-aided transcription.

GA02

RUSSO - DIRECT - POLLACK                    68

that:

We're not talking about consumers or businesses stockpiling supplies for their own operations, we're talking about people hoarding these goods and materials on an industrial scale for the purpose of manipulating the market and ultimately driving windfall profits.  If you have a big supply of toilet --

MR. POLLACK:  Wait there and we'll turn to the next page.

Can you take the whole -- can you zoom in on the whole next paragraph, Mr. Flink?

Thank you.

Q    So the last word is "toilet".

Can you continue from there?

A    -- paper in your house, this is not something you have to worry about.  But if you are sitting on a warehouse with masks, surgical masks, you will be hearing a knock on your door.

Q    Can you just read the next sentence?

A    AG Barr has also announced the creation of a COVID-19 hoarding and price gouging task force to investigate and prosecute violations of the anti-hoarding and anti-price gouging provisions of the DPA.

Q    Yesterday you told us that you sent an email to Bill Young in your undercover capacity.

RUSSO - DIRECT - POLLACK                    69

Do you remember that?

A    Yes.

Q    When you were working in an undercover capacity to send that email to Mr. Young, were you doing that in connection with the COVID-19 hoarding and price gouging task force?

A    Yes, it was a direct response to that.

MR. POLLACK:  Thank you.

Q    After you sent that email to Bill Young, did there come a time when you spoke to Bill Young on the telephone?

A    Yes.

Q    Where were you located when you had that phone call?

A    On the Long Island, in the Eastern District of New York.

Q    And was that telephone call recorded?

A    It was.

Q    Have you previously listened to an audio recording, which is already in evidence, as Government Exhibit 101?

A    Yes, I have.

Q    And is that the recording of the telephone call you had with Bill Young?

A    It is, yes.

MR. POLLACK:  Your Honor, may we play Exhibit 101 for the jury?

THE COURT:  Yes.

MR. POLLACK:  And I'll note that we're going to have it -- we're going to try to have a transcript on the screen,

RUSSO - DIRECT - POLLACK                    70

but everyone should have a binder under their chairs which have transcripts in it.

101T is behind Tab A of the binders.

So, Mr. Flink, at first if we can just play the first five seconds of the recording.

(Audio recording played.)

(Audio recording stopped.)

MR. POLLACK:  Can you pause it?

So we're stopping at five seconds.

Q    Who is speaking there?

A    That is Bill Young.

Q    Is bill Young also known as William?

A    Yes, William Young.

MR. POLLACK:  Okay, let's play just to the nine-second mark.

(Audio recording played.)

(Audio recording stopped.)

Q    Who is the other person on the call?

A    That is me.

MR. POLLACK:  Can you play to 1 minute 50?

(Audio recording played.)

(Audio recording stopped.)

MR. POLLACK:  So stopping at one minute 50 seconds.

Q    What was your understanding of the procedure here for how this was supposed to work?

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

RUSSO – DIRECT – POLLACK                71

A    Before we could purchase the masks, we needed to send the funds for that purchase to the defendant's attorney trust account.

          MR. POLLACK:  All right let's continue playing 'til four minutes 28 seconds.

          (Audio recording played.)

          (Audio recording stopped.)

          MR. POLLACK:  Stopping at four minutes 28 seconds.

Q    Who did he say the attorney is?

A    The defendant, Kent Bulloch.

Q    And he's the one with the attorney trust account; is that right?

A    Yes.

          MR. POLLACK:  Okay, let's continue playing to seven minutes 27 seconds.

          (Audio recording played.)

          (Audio recording stopped.)

          MR. POLLACK:  Stopping at seven minutes 20 seconds.

Q    In the recording you were in New York.

          Was that true?

A    Yes.

Q    And I think you said before you were in Long Island?

A    Yes.

          MR. POLLACK:  Let's continue playing this to 743.

          (Audio recording played.)

RUSSO - DIRECT - POLLACK                    72

(Audio recording stopped.)

MR. POLLACK:  Stopping at 743.

Q    On the recording it says, Doctors, nurses, and cops are in desperate need for these masks in New York because they're dying.

Was that true?

A    Yes.

MR. POLLACK:  Let's continue playing just to 804.

(Audio recording played.)

(Audio recording stopped.)

MR. POLLACK:  So stopping at eight minutes four seconds.

Q    When Bill Young says "I don't care what you charged," what was your understanding of what that meant?

A    That he didn't care how much, how high the price I would be selling -- reselling these things for.

MR. POLLACK:  Let's continue playing until 12 minutes 56 seconds.

(Audio recording played.)

(Audio recording stopped.)

MR. POLLACK:  Stopping at 12 minutes 56 seconds.

Q    Bill Young said not a problem, and that's why he used an attorney trust.

What did you understand that to mean?

A    I understood that to mean that the defendant can disguise

RUSSO - DIRECT - POLLACK                                73

my involvement in this transaction, which was a criminal transaction.

MR. GUTMAN:  Objection, Your Honor.

THE COURT:  I'm sorry.

MR. GUTMAN:  I object to the witness' characterization.  It's for the jury to decide.

MR. POLLACK:  Should we have a sidebar?

THE COURT:  Okay.  So, yes, because I don't understand exactly what you're objecting to.

(Continued on the next page.)

(Sidebar conference.)

SIDEBAR CONFERENCE                74

(The following occurred at sidebar.)

THE COURT:  What is the objection?

MR. MEHTA:  Let me say one thing.  Do not make any objections without the jury.

MR. GUTMAN:  Yes.

Your Honor, the objection is it's the witness' conclusion as if he's an expert on the law that this is a criminal transaction.  That is not an opinion.

First of all, opinion evidence shouldn't be admissible at all, and it's prejudicial in the context.

THE COURT:  I don't remember what your question was.

MR. POLLACK:  The question was what was your understanding of the statement, and it was not offered for the fact, but the truth of the matter to speculate or give any ultimate conclusions.  But he's having an ongoing conversation it is his responses that follow, and his understanding of what that meant sort of explains his -- the witness' state of mind, when he made followup responses and had a conversation.

THE COURT:  The objection is overruled.

(End of sidebar conference.)

(Continued on the next page.)

RUSSO - DIRECT - POLLACK                75

(In open court; Jury present.)

THE COURT:  The objection is overruled.

You may answer the question.

MR. POLLACK:  I think he already answered it.

Q    Can you repeat your answer?

A    Sure.  Bill Young was saying that we could use --

MR. POLLACK:  Let me stop you, I'll ask you the question again.

A    Yes.

Q    I said:  When Bill Young said that's not a problem, that's why we use the attorney trust, what was your understanding of what that meant?

A    That I would be using the attorney trust account so that my name would not be associated with this transaction which I believed to be price gouging.

MR. POLLACK:  Okay, let's continue playing 'til 14 minutes 20 seconds.

(Audio recording played.)

(Audio recording stopped.)

Q    When Bill Young says -- I think you said something about waters?

A    Yes.

Q    And you said, We're all in the same boat.

Again, what was your understanding of what that meant?

RUSSO - DIRECT - POLLACK                76

A    My understanding of telling him that I was swimming in the stock, it's actually promotion waters, was that I had been involved in some previous activity that was not actually aboveboard, and that in addition to that, I had not gone to, you know, put in jail for that prior activity.  And in addition to that currently, doing this current activity, I did not want to go to jail, because I had been out of jail for so long.

Q    And when he said "we're all in the same boat," what did you take that to mean?

A    That he was -- he and the defendant, Kent Bulloch, were in the same boat as I about wanting to stay out of jail being involved in these transactions.

        MR. POLLACK:  Okay, now let's continue playing 18 minutes 40 seconds.

        (Audio recording played.)

        (Audio recording stopped.)

        MR. POLLACK:  Stop there at 18 minutes 40 seconds.

Q    When you said, We can talk freely, he's a guy like us, what did you mean by that?

A    What I meant was that the nature of the transaction that we were currently involved in was improper, and I had had previous dealings with Bill Young that were improper, and I wanted to know from Bill if Kent was like us, and he said "Yes".

GA11

RUSSO - DIRECT - POLLACK                     77

Q    Why did you answer the question?

A    Because I wanted to actually just be able to talk freely to him so that we could be transparent in our future conversations and be transparent.

Q    Before you heard Bill Young, did you know what answer he was going to give?

A    I had never heard of Kent Bulloch, the defendant, before that.

MR. POLLACK:  Let's keep playing until 20 minutes four seconds.

(Audio recording played.)

(Audio recording stopped.)

MR. POLLACK:  Stopping at 20 minutes four seconds.

Q    When Bill Young said, If it's something we can't do, then we figure out how to do it.

What did you understand that to mean?

A    Simply that.  That if it was something that we can't do, the defendant, Kent Bulloch, would figure out a way for us to do it, even if it was something that you couldn't do.

MR. POLLACK:  Let's continue playing.

(Audio recording played.)

(Audio recording stopped.)

MR. POLLACK:  Mr. Flink, can we go back to the very first page of the transcript.

Q    So what was the date and time of that phone call?

RUSSO - DIRECT - POLLACK                78

A    April 21st, 2020, at 8:05 p.m.

MR. POLLACK:  Now I'd like to direct your attention to Government Exhibit 9, which is already admitted.

(Exhibit published.)

Q    Who is this email from?

A    It's from Bill Young.

Q    Is that the email address there, the email address that you used when you communicated with him?

A    Yes.

Q    Who is this email to?

A    It is to me.

Q    In your undercover capacity?

A    Correct.

Q    Can you read the subject line of that email?

A    Don Mask Deal, Bullock's Wells Fargo.

Q    And what's the date and time it was sent?

A    April 21st, 2020, at 8:54 p.m.

Q    So just shortly after that call?

A    Yes.

Q    What, in general, does this email contain?

A    It contains bank wire -- bank instructions for defendant Kent Bulloch.

MR. POLLACK:  And now I'll direct your attention to Government Exhibit 11, which is already in evidence.

(Exhibit published.)

RUSSO - DIRECT - POLLACK                79

Q    What is this?

A    It's an email from Bill Young to me and to the defendant.

Q    And when was this sent?

A    It was sent April 22nd, 2020, at 1:11 p.m.

Q    And can you read the subject line?

A    Ryan numbers.

Q    And "Ryan" was the name you were using, right?

A    Yes.

Q    Can you read for us the first two bolded lines at the top of that email?

A    1 million in US KN95 face mask respirators.

     Kent payment mask total.

Q    And can you read the bolded to the left of that?

A    4,180,000.

Q    Skipping down to the horizontal line beneath that, can you read the two bolded lines there?

A    2.5 million in US 3-ply face mask.

     Kent payment mask total.

Q    And can you read the bolded and highlighted total number?

A    2,100,000.

     MR. POLLACK:  I'll direct your attention now to Government Exhibit 12, which is already in evidence.

     (Exhibit published.)

Q    Who sent this email?

A    I did.  In the undercover capacity.

GA14

RUSSO – DIRECT – POLLACK                    80

Q    Who did you send it to?

A    To Bill Young and to the defendant.

Q    When did you send it?

A    April 22nd, 2020, at 2:09 p.m.

Q    Can you read the email for us?

A    Gents, will call shortly.  Please review attached.  I will explain details.  Kind regards, Ryan.

         MR. POLLACK:  Mr. Flink, can you zoom out on to table 5.

         And I'll note that this, although it appears in a line of the email, it also appears as a separate attachment as Government Exhibit 12A.

Q    But what, in general, does this table show?

A    The table is -- it's an Excel spreadsheet that indicates the purchase price of $3.80, and also potential sale prices from $5.70 to $6.50.

         It also shows the profit that would be made on the million masks and the percentages of -- that we would all receive.

Q    Starting at the lowest markup being 5.70, is that a 50 percent markup?

A    Yes.

         MR. POLLACK:  Can we look now -- Mr. Flink, can you zoom out and go to the second page?

         (Exhibit published.)

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

GA15

RUSSO - DIRECT - POLLACK                    81

MR. POLLACK:  Can you zoom in on that table.

Q    What is this table showing?

A    This table shows the actual dollar value of the transaction of the million masks.

Q    And so do the profits on this table correspond to the markups on the prior table?

A    Yes.

Q    And if we just look at the rows for -- that show 10 percent for Bill and Kent, what's the range of possible profit?

A    That they would profit of 190,000 on the low end and 270,000 on the high end based upon these amounts.

Q    And that's just for the one transaction?

A    For the 1 million masks, yes.

Q    After sending that email to Bill Young and the defendant, did you have a phone call with both of them?

A    Yes.

Q    Where were you located when you had that call?

A    On Long Island, in the Eastern District of New York.

Q    Have you previously reviewed an audio recording that is already in evidence as Government Exhibit 102?

A    Yes.

Q    What is that audio recording?

A    It's a recording of a conversation between myself and the defendant, Kent Bulloch, and Bill Young.

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

RUSSO - DIRECT - POLLACK                    82

Q    Is that the call that you made after sending this email?

A    Yes.

MR. POLLACK:  Your Honor, may we can play Government Exhibit 102 for the jury.

THE COURT:  Yes, go ahead.

MR. POLLACK:  And this is under Tab B in your binders.

(Audio recording played.)

(Audio recording stopped.)

MR. POLLACK:  I'm going to ask you to pause. Stopping at 25 seconds.

Q    When you said you made an appointment and didn't keep it, do you understand what he was talking about?

A    Yes.  He was referring to the fact that I was a little late for the phone call that we had scheduled at 2:00.

Q    So what's the time of this call?

A    The time of this call is 2:47.

Q    Did you just say that it was supposed to be at 2:00?

A    Supposed to be at 2:00 call, so he was upset that I was a little late to get on the phone call.

MR. POLLACK:  You can continue playing, Mr. Flink.

(Audio recording played.)

MR. POLLACK:  Skip over to four minutes 35 seconds.

(Audio recording played.)

MR. POLLACK:  Stopping at seven minutes 16 seconds.

GA17

RUSSO - DIRECT - POLLACK                                   83

Q    What's your understanding of what's being discussed here?

A    What's being discussed is the defendant is talking about the situation, talking about that the writing's on the wall that there is a global pandemic, that there is a real shortage of these masks, and that people are starting to realize that there's a real profit to be made here based upon the pandemic.

Q    And the reference to the government in there, what was your understanding of what refers to?

A    At that time, you know, we were in crisis mode and the Defense Product Act was enacted and the government was cracking down on hoarding and price gouging.  I believe that's what he meant.

          MR. POLLACK:  Continue playing 'til nine minutes 11 seconds.

          (Audio recording played.)

          (Audio recording stopped.)

          MR. POLLACK:  Stopping at nine minutes 11 seconds.

Q    What was your understanding of what rotated through as fast as possible meant?

A    My understanding was that we would purchase the first million masks, and then once that transaction was done and we had the proceeds from the sale of that went back into the trust account, that we would then buy more masks and just keep rotating money to continually buy masks.

          MR. POLLACK:  Let's play the recording until 13

RUSSO - DIRECT - POLLACK                    84

minutes 47 seconds.

(Audio recording played.)

(Audio recording stopped.)

MR. POLLACK:  Stopping at 13 minutes and 47 seconds.

Q    What did you understand that -- what was your understanding of what that meant about making sure you're going to get invoiced on it?

A    That if Bill Young relayed to defendant Kent Bulloch that I did not want my name associated with this transaction.  I did not want my name on any documents with respect to the transaction.

MR. POLLACK:  Let's continue playing to 14 minutes 19 seconds.

(Audio recording played.)

(Audio recording stopped.)

MR. POLLACK:  Stopping at 14 minutes 19 seconds.

Q    What were you -- what was your understanding of what you were asking the defendant to do here?

A    I was -- the situation was, is that I was going to buy these masks for 3.8 million, so I was going to send 3.8 million into his attorney account.  He was going to buy the masks.  And so my money would go out from there.

And I would get the masks, and then I would sell the masks to seven to ten buyers, and when I sold those masks at a price of $5.70, the people that were buying them from me at

RUSSO - DIRECT - POLLACK                    85

that point would send the money for the purchase into the

defendant's attorney trust account.

Q    And what -- did you understand that to be what Bill Young

had suggested on the call?

A    Yes.

        MR. POLLACK:  Let's continue playing until 15

minutes 20 seconds.

        (Audio recording played.)


        (Continued on the following page.)

GA20

RUSSO - DIRECT - POLLACK                    86

DIRECT EXAMINATION (Continued)

MR. POLLACK:  Stopping at 15 minutes 20 seconds.

BY MR. POLLACK:

Q    What was your understanding of what that $3.8 million was?

A    The $3.8 million was the cost of the masks.

So, when I would sell the masks for 5.7 million, the difference would be 1.9 million in profit.  So, he's suggesting -- and that money will all be accumulated in his bank account, the 5.7 million.

He is suggesting that I do not remove the 3.8 million that just covered the cost of the masks but that I used that 3.8 million to buy a new set of masks.  And the profit of the 1.9 million that we were all sharing could be removed, but we would leave the cost -- the initial cost so we could continue to buy masks.

MR. POLLACK:  Let's continue playing until 16 minutes 39 seconds.

(Audio plays; audio stops.)

MR. POLLACK:  Stopping at 16 minutes 39 seconds.

Q    What were you asking for here?  What did you understand yourself to be asking for?

A    I was asking the Defendant to create a fake invoice so that it wouldn't look like I was price gouging, which I was price gouging.  And I asked him, because I was selling these

LAM     OCR     RPR

RUSSO - DIRECT - POLLACK                    87

at $5.70, I didn't want anybody to know I purchased them at $3.80, the huge profit in there. So, I asked that he make a document that would show not that I bought them for $5.70 but that I bought them for $5.60, only a ten-cent profit and not the huge profit that was being made.

He suggested he could do that but he suggested to me making the margin even more than ten cents. So, not $5.70, but that I bought it at $5.50. So, he was telling me what we could do to create this fake invoice.

Q    What was your understanding of why 21 cents would be preferable to 10 cents; did you have an understanding of that?

A    Not a full understanding, not a full understanding of that, other than him trying to make it look in his -- I believe -- I don't know the full answer as to why he suggested 21 cents. It was just different from what I had suggested.

MR. POLLACK: We'll play until 17:04.

(Audio plays; audio stops.)

MR. POLLACK: Stopping at 17 minutes and 4 seconds.

Q    When the Defendant said if you have to show somebody the invoice, you've already got a bigger problem than you'll probably going to be able to handle, what did you understand that to mean?

A    I understood that to mean that if somebody's asking me for the invoice, they already know that you're doing something improper and that by indicating that, you know, the federal

*LAM     OCR     RPR*

RUSSO - DIRECT - POLLACK                    88

government will come in even if you're making one penny per mask, that he -- I understood that he believed it was wrong to even charge one penny as opposed to the massive profit that we were charging.

MR. POLLACK:  Let's play until 23 minutes 25 seconds.

(Audio plays; audio stops.)

MR. POLLACK:  Stopping at 23 minutes 25 seconds.

Q   What was your understanding of what the Defendant was proposing here?

A   The Defendant was proposing that we don't create two different documents that would contradict each other, meaning that we put a fake price on one document and the real price on another document; and that if I was raided and these documents were reviewed, that people would know there was something wrong.

Q   So, what's the proposal instead of putting the real price?  What's being put instead?

A   The Defendant proposed instead of putting the actual prices that could be contradicted if there was a raid, just keep it as percentages.

MR. POLLACK:  Let's continue playing just to 23 minutes 43 seconds.

(Audio plays; audio stops.)

MR. POLLACK:  Stopping at 23 minutes 43 seconds.

*LAM      OCR      RPR*

GA23

RUSSO - DIRECT - POLLACK                    89

Q    What did you understand in this conversation "complacent" to mean?

A    I understood complacent to actually mean complicit, which complicit means involved in illegal activity.

         MR. POLLACK:  Continue playing, please, to 24 minutes 50 seconds.

         (Audio plays; audio stops.)

         MR. POLLACK:  Stopping at 24 minutes 50 seconds.

Q    What did you understand the statement to mean about having to do it in person because he's too worried about electronic instructions?

A    I understood that to mean that he didn't want a record of his involvement in the transaction and, also, that he wanted to be there to actually physically safeguard the masks.

         MR. POLLACK:  Let's continue playing until 26 minutes 44 seconds.

         (Audio plays; audio stops.)

         MR. POLLACK:  Stopping at 26 minutes 44 seconds.

Q    What did you understand yourself to be asking for here?

A    For him to create some sort of document that I could show the purchasers of the masks that were going to purchase it from me that I was not making, as I said, a shitload of money, to clearly indicate that we were making a ton of money here, and I didn't want the buyers to know that.

Q    In the context of this conversation, what was your

                    *LAM    OCR    RPR*

RUSSO - DIRECT - POLLACK                    90

understanding of what not wanting to create an exposure for myself to mean?

A    I understood that to mean that the Defendant was aware that we were involved in price gouging and he did not want to be exposed for doing that, I believe.

MR. POLLACK:  Please continue playing to 27 minutes 50 seconds.

(Audio plays; audio stops.)

MR. POLLACK:  Stopping at 27 minutes 50 seconds.

Q    What was your understanding of what red flags for you and red flags for us, what was your understanding of that?

A    My understanding was that the Defendant, Kent Bulloch, Bill Young, and myself were all committing price gouging and if it was red flag for me it would lead to them as well.

MR. POLLACK:  Continue playing just to 28 minutes 5 seconds.

(Audio plays; audio stops.)

MR. POLLACK:  Stopping at 28 minutes 5 seconds.

Q    What did you understand the reference to "orange" to be?

A    Orange is typically the color of the jumpsuit that a prisoner wears in prison, and the Defendant, Kent Bulloch, was saying that his pinkish skin would not look good in orange.

MR. POLLACK:  Let's continue playing just to 29 minutes 36 seconds.

(Audio plays; audio stops.)

*LAM     OCR     RPR*

RUSSO - DIRECT - POLLACK                    91

MR. POLLACK:  Stopping at 29 minutes 36 seconds.

Q    What was your understanding of the meaning of:  If it takes two weeks, we're not going to get a lot of cycles in.

A    My understanding of that was that at this time, these masks were so scarce and they were not being produced in mass quantities and that we needed to act quickly and sort of cycle the money in and out as quick as possible so that while the masks were available to purchase, we would be able to do that.

MR. POLLACK:  Continue playing the recording, please.

(Audio plays; audio stops).

MR. POLLACK:  I'd like to direct your attention now to Government Exhibit 20, which is already in evidence pursuant to a stipulation that it contains text messages from the Defendant's cell phone.

(Exhibit published to the jury.)

Q    If we look down first to the bottom row, which I think in the Excel spreadsheet is Row 14, and the number there is 64, can you read us the date and time that message was sent?

A    April 22, 2020 at 10:52 a.m.  That's West Coast time.

Q    What would that be on the East Coast?

A    That would be 1:52.

Q    Was that the date of the telephone call, 4/22/2020?

A    Yes.

Q    What time did you say that call was supposed to be for?

*LAM      OCR      RPR*

GA26

RUSSO - DIRECT - POLLACK                                    92

A     2 p.m.

Q     That's an outgoing message, it says, from the Defendant's cell phone?

A     Yes, outgoing from the Defendant.

Q     Who is it going to?

A     Bill Young.

        MR. POLLACK:  Mr. Flink, if we could scan to the right to the get to the contents of that message.

Q     Can you read the context of the content of that message?

A     The call is at 11?

Q     That is, the call is at two on the East Coast?

A     Yes.

Q     If we could read the next message, which is going to be up one, when was this -- I'll direct your attention just to that message which is on Row 13 of the spreadsheet, which is numbered 63.

        That also is an outgoing message, right?

A     Yes.

Q     Who is that to?

A     It is to Bill Young.

Q     What time was that message sent?

A     12:20, which would be 3:20.

Q     Is that on that same date?

A     Yes.

        MR. POLLACK:  Can we go to the right and see the

*LAM      OCR      RPR*

GA27

RUSSO - DIRECT - POLLACK                                       93

message?

Q    Can you read the content of that text message?

A    Sorry, I can't talk right now.

Q    Looking up one message up from there, who is this message from?

A    It's a message from Bill Young.

Q    And what time was this sent?

A    At 12:21, which is 3:21 Eastern time.

Q    Is that after the phone call we just listened to?

A    It is.

     MR. POLLACK:  Can we scroll to the right?

Q    What's the message content?

A    What was his gross number?

     MR. POLLACK:  Can we scan up one further, Mr. Flink?

Q    Is this an outgoing message?

A    Yes.

Q    Who is it to?

A    To Bill Young.

     MR. POLLACK:  Mr. Flink, can you scan to the right?

Q    And what does that message say?

A    1,900,000.

Q    Do you recognize that number?

A    I do.

Q    What is that number?

A    That is the profit that the three of us would have made

RUSSO - DIRECT - POLLACK                          94

on this transaction, the total profit.

MR. POLLACK:  Mr. Flink, can you scan up?

Q    What's identified there as number 60 from Bill Young, what time is that message sent?

A    1:57, which would be 4:57 Eastern time.

MR. POLLACK:  Can you scan to the right, Mr. Flink?

Q    And could you read that message for us?

A    Check your e-mail.  Is that what you are looking for?

MR. POLLACK:  Mr. Flink, can you scan up one message?

Q    This one, it says it's an outgoing message from the Defendant, right?

A    Yes.

Q    What time was that sent?

A    2:02, which is 5:02 Eastern time.

Q    And who is that to?

A    To Bill Young.

MR. POLLACK:  And Mr. Flink, can you scan to the side?

Q    Can you read that?

A    Ten percent of net.  Net is defined as total money from final sell of goods less cost of products.

Q    Is there a typo in that?

A    Yes.

Q    Can you tell us what it is?

*LAM     OCR     RPR*

RUSSO - DIRECT - POLLACK                    95

A    Where it says final "sell" of goods it should be final "sale" of goods.

Q    We'll come back to that in a moment.

Did Mr. Young respond to that message?

MR. POLLACK:  Mr. Flink, can you scan above for me?

Scan up one message, the one with the number 53 next to it, I think.

Go to the right -- sorry, I apologize.  Withdrawn.

Mr. Flink, can you scan one beneath that one, 57, and scan to the right?

Q    Mr. Russo, can you read that text message?

A    Okay.

Q    On that call, we heard you ask about this document with the fake numbers.

Did the Defendant send you a document like that?

A    Yes, he did.

Q    I will direct your attention to Government Exhibit 13, which is already in evidence.

(Exhibit published to the jury.)

Q    Who is this message from?

A    From the Defendant, Kent Bulloch.

Q    Now, in this copy, the e-mail address is redacted, but do you know who this message was sent to?

A    Yes.  It was sent to me in an undercover capacity.

Q    So, we redacted your undercover e-mail address; is that

RUSSO - DIRECT - POLLACK                    96

right?

A    Yes.

Q    Can you read the body of that e-mail?

A    Yes.

          Here is what you asked for.  Just inserted some verbiage in my existing escrow contract.

Q    What's the date and time on that; do you know?

A    April 22, 2020, 5:21 p.m.

Q    So, is that around the time of those text messages we just read?

A    Yes.

Q    Does this e-mail have an attachment?

A    Yes, it does.

Q    I'll direct your attention to Government Exhibit 13A, which is already in evidence.  It's the attachment to the e-mail.

          (Exhibit published to the jury.)

Q    Can you read for us the big bolded line at the top?

A    Law Offices of Kent Bulloch.

          MR. POLLACK:  Now, Mr. Flink, can you zoom in from "parties to the escrow" down to the paragraph that starts "client."

Q    Can you read for us the parties to the escrow?

A    This escrow, the escrow, is established by and between among Ryan Russo, a New York resident, herein after referred

RUSSO - DIRECT - POLLACK                    97

to as the client, and the Law Offices of Kent Bulloch, herein after referred to as the escrow agent, shall act as a nonbiased escrow agent.

Q    Can you read for us the purpose of this escrow?

A    The client has entered into various sales agreements for the sale of antiviral face masks.  Each contract shall be lodged with the escrow agent with specific instructions for cash disbursement.

Q    And can you read for us the paragraph beginning "client"?

A    Client understands that no more than ten shall be allocated above costs for resale of masks.  Client shall not charge more than ten percent above costs to secondary buyer. For example, if masks cost $5.50, client will not resell masks above $6.05.

Q    I think you just read, but who is the client defined to be here?

A    It is defined to be me in an undercover capacity.

Q    And was it true that you understood that no more than ten percent shall be allocated above costs for resale of masks and that you shall not charge more than ten above costs to secondary buyer?

A    No, that was a fraudulent claim.

Q    Turning to the last page of this document, can you read for us the names --

         MR. POLLACK:  Mr. Flink, if you could zoom in on the

*LAM       OCR       RPR*

RUSSO - DIRECT - POLLACK                98

signature block.

Q    Can you read for us the names on that signature block?

A    Kent Bulloch and Ryan Russo.

Q    I'll direct your attention now to Government Exhibit 14.

THE COURT:  Can I interrupt, Mr. Pollack?

It's 11 o'clock and I would like to give the jurors a break.  Is this a good time?

MR. POLLACK:  This is a fine time, Judge.

THE COURT:  Let's take a 15-minute break so everybody can stretch and be back here promptly at 11:15.

Please leave the binders on your chairs.

(Jury exits.)

THE COURT:  Thank you, everybody.  See you at 11:15.

(Recess taken.)

THE COURT:  Are you ready to resume, Mr. Pollack?

MR. POLLACK:  Yes, your Honor.

THE COURT:  We'll bring in the jury.

I'd like to break for lunch between 12:30 and 1, some point in that time, whatever is a good breaking point.

MR. POLLACK:  Okay.  Thank you, Judge.

(Jury enters.)

THE COURT:  Please be seated.

Mr. Russo, I remind you that you are still under oath.

Mr. Pollack, you may resume the questioning.

RUSSO - DIRECT - POLLACK                    99

MR. POLLACK:  Thank you, your Honor.

Mr. Flink, can we go back to where we left off, Exhibit 13A, and take it to the first page?

And can you zoom back in on the paragraph beginning "client understands"?

BY MR. POLLACK:

Q    Mr. Russo, a minute ago you read from this that the client shall not charge more than ten percent above costs to secondary buyer and you said it was false or used the word fraudulent.

What was the -- in the agreement you had made with the Defendant and Bill Young, what was the actual markup supposed to be?

A    We agreed to mark it up 50 percent.

Q    Thank you.  I'll now direct your attention to Government Exhibit 14.

(Exhibit published to the jury.)

Q    Who is this from?

A    It's from Bill Young.

Q    And who is it to?

A    It is to me in an undercover capacity and to the Defendant, Kent Bulloch.

Q    And what is the date and time that it was sent?

A    April 22, 2020, at 5:41 p.m.

Q    Is that East Coast time?

GA34

RUSSO - DIRECT - POLLACK                    100

A     Yes.

Q     Is this also around the same time of those texts that we just looked at between the Defendant and Bill Young?

A     Yes.

Q     Can you read the first bolded line?

A     1 million in US KN95 face mask respirators.

        MR. POLLACK:  Mr. Flink, if you could zoom out and zoom in between that -- starting at that bolded line we just read and then down to the horizontal line.

Q     Beneath the bolded line that you just read, Mr. Russo, speaking generally, what appears to be beneath that?

A     It's banking account information for the Law Office of Kent Bulloch.

        MR. POLLACK:  Mr. Flink, can you zoom out and now zoom in to everything beneath the horizontal line?

Q     Mr. Russo, can you read for us the bolded stuff beneath that horizontal line?

A     Kent mask payment is percent of net.  Net is defined as total money from final sell of goods less cost of products.

Q     Do you recognize those words?

A     I do.

Q     From where?

A     From the previous text that was sent from the Defendant, Kent Bulloch, to Bill Young.

Q     The one we just looked at a minute ago?

*LAM      OCR      RPR*

RUSSO - DIRECT - POLLACK                101

A     Yes.

Q     Is that the one that you saw the typo in?

A     Yes.

Q     Is the same typo here?

A     It is, yes, final "sell" of goods where it should say final "sale" of goods.

Q     And speaking generally about the material beneath the horizontal line, what does this appear to show?

A     That is the agreement that the three of us had entered into; that the Defendant would get ten percent, Bill Young would get ten percent, and that I would get eighty percent.

          MR. POLLACK:  Can you zoom out, Mr. Flink?

          Can you turn to the second page?

Q     Mr. Russo, can you read the bolded line?

A     Funds staying with Kent Bulloch IOLTA account, same referenced above.

          MR. POLLACK:  Can you zoom back out?

Q     So, on the call that we listened to, we heard reference to, and you described, an agreement with just percentages on it and no actual numbers.

          Is this that agreement?

A     Yes, this is that agreement.

Q     And what was your understanding of what that agreement was to do?

A     This agreement laid out what percentage each of us would

*LAM     OCR     RPR*

RUSSO - DIRECT - POLLACK                    102

get of the profit.  So, the profit of $1.9 million, the Defendant, Kent Bulloch, would get $190,000, Bill Young would get $190,000, and I would get the remainder of the profit.

Q    And what was your understanding of what that profit was going to be from?  Profit from what?

A    The profit from the sale of the KN95 masks.

Q    At what markup?

A    At 50 percent markup.

Q    I'll direct your attention now to Government Exhibit 15.

        (Exhibit published to the jury.).

Q    Who is this e-mail from?

A    It's from Bill Young.

Q    What's the subject?

A    Masks closing.

Q    And what date and time was it sent?

A    April 22, 2020, at 9:07 p.m.

Q    Who did Bill Young send this e-mail to?

A    He sent it to me in an undercover capacity and to the Defendant, Kent Bulloch.

Q    Can you read the e-mail to us?

A    Ryan, how are we looking for closing tomorrow?  Do you need anything from me or Kent?  Bill.

Q    Did you respond to that e-mail?

A    Yes.

Q    I'll direct your attention to Government Exhibit 16,

GA37

RUSSO – DIRECT – POLLACK                103

already in evidence.

(Exhibit published to the jury.).

Q    Is this your response?

A    Yes.

Q    Who is it to?

A    It is to Bill Young and the Defendant.

Q    Can you read it for us?

A    Bill, received your e-mail with our percentages. Received the escrow agreement from Kent.  I will execute the agreement and send back tomorrow.  I am consolidating the $3.8 million and expect to have wire sent no later than Friday.  Funds should hit Kent's escrow on Monday.  Kind regards, Ryan.

Q    And you refer to an escrow agreement.

What were you referring to?

A    To the agreement that the Defendant had prepared indicating that I would not mark up the cost of the masks any more than ten percent.

Q    Did you, in fact, sign the agreement and send it the next day like you said?

A    I did.

Q    I'll direct your attention to Government Exhibit 17, already in evidence.

(Exhibit published to the jury.)

Q    What is this?

*LAM      OCR      RPR*

RUSSO - DIRECT - POLLACK                          104

A    It is an e-mail from me in an undercover capacity to Kent Bulloch, the Defendant, and Bill Young.

Q    And this is the next day?

A    It is.

Q    Can you read the e-mail to us?

A    Good morning, Kent.  Attached is the escrow agreement signature page.  Kind regards, Ryan.

         MR. POLLACK:  Mr. Flink, can you zoom out and turn to Exhibit 17A, also in evidence, which is the attachment.

         (Exhibit published to the jury.)

Q    Is this the attachment to that e-mail?

A    Yes.

Q    What is it?

A    It's the signature page of the document.  And I have signed it.

Q    So, this is the same document that we looked at a minute ago when it was unsigned?

A    Yes.

Q    Let's look again at the text messages in Government Exhibit 20.

         (Exhibit published to the jury.)

Q    I'll direct your attention to Row 5, which has the number 53 next to it.  It's an incoming messaging from Bill Young.

         What's the date and time that was sent?

A    April 23, 2020, at 9:48, which would be 12:48 Eastern

*LAM      OCR      RPR*

RUSSO - DIRECT - POLLACK          105

time.

MR. POLLACK:  And Mr. Flink, can you scroll to the right so we can see the content?

Q    Would you read for us the text message?

A    I see Ryan sent you his signature page.  No do you eat the countersign that page or is it ready to move forward with separate signature pages?

Q    There seems to be a typo there.

What was your understanding -- what is your understanding of what that meant?

A    My understanding was that he sees that I signed the signature page and do you need to countersign it?

MR. POLLACK:  Mr. Flink, can you go up one above that?

Q    This is the row identified as number 52.  It's an outgoing message from the Defendant to Bill Young.

MR. POLLACK:  Mr. Flink, can you scan over to the content?

Q    Mr. Russo, can you read that text messaging?

A    I am signing it now.  He will have back shortly.

Q    Did the Defendant, in fact, sign it and send it back to you?

A    He did.

Q    I'll direct your attention to Government Exhibit 18, already in evidence.

RUSSO - DIRECT - POLLACK                106

(Exhibit published to the jury.)

Q    What is this?

A    It is the signature page and it's signed by the Defendant and myself.

Q    And who sent this?

A    The Defendant, Kent Bulloch.

Q    What date and time did he send it?

A    April 23, 2020, at 12:55 p.m.

Q    Now, I'm going to show on you a document not yet in evidence --

        MR. POLLACK:  So, not published, just to the witness.

Q    -- marked for identification as Government Exhibit 10.

        Are you able to see it?

A    I cannot, but I have it in the binder.

Q    You have Government Exhibit 10 in the binder so you can see it.

        Do you recognize that document?

A    I do.

Q    What is it?

A    It's a spreadsheet containing texts between myself and Bill Young.

Q    Have you reviewed the entire document?

A    I have.

Q    Is it a fair and accurate copy of the text messages

*LAM      OCR      RPR*

RUSSO - DIRECT - POLLACK                   107

between you and Bill Young from April 21 to April 27, 2020?

A     Yes.

          MR. POLLACK:  I'm going to offer Government Exhibit 10.

          THE COURT:  Any objection?

          MR. GUTMAN:  No objection.

          THE COURT:  Government Exhibit 10 is admitted.

          (Government Exhibit 10, was received in evidence.)

          MR. POLLACK:  May we publish to the jury, your Honor?

          THE COURT:  Yes.

          (Exhibit published to the jury.)

Q     I'm going to direct your attention to the third page of this document; in particularly, the message from April 23, 2020, at 1:55 p.m.

          The message at 1:55 p.m. who sent that message?

A     Bill Young.

Q     What does the "WY" represent?

A     It represents William Young.

Q     Can you read that message for us?

A     I just got off Kent about another deal we're doing.  He said countersigned it and sent it back to you.  So the ball's in your court, just please give me updated.

Q     Can you read the next message?

A     I need to be a bit pushy here, but we're getting close to

*LAM      OCR      RPR*

RUSSO - DIRECT - POLLACK                108

the witching hour.  Is this going to happen today or tomorrow?
Because we have 600,000 pending for you.

Q    And can you read your response?

A    You are not being pushy.  Ball is in my court and we are
on target for 3,800,000 funds for 1 million masks to hit
Kent's escrow account on Monday.

Q    After you told Bill Young that the money would hit the
Defendant's account on Monday, did you have another phone call
with Bill Young?

A    Yes.

Q    And where were you located when you had that phone call?

A    On Long Island, in the Eastern District of New York.

Q    Have you previously reviewed an audio recording already
in evidence as Government Exhibit 103?

A    I have.

Q    Was it a recording of that phone call?

A    Yes.

        MR. POLLACK:  Your Honor, may we play Government
Exhibit 103 for the jury?

        THE COURT:  Yes.

        MR. POLLACK:  This is in everyone's binders under
Tab C.

        Why don't we start at the beginning?

        (Audio plays; audio stops.)

        MR. POLLACK:  Can you skip up to one minute five

*LAM     OCR     RPR*

RUSSO - DIRECT - POLLACK                  109

seconds?

                    (Audio plays.)

                    MR. POLLACK:  Stop there.

                    (Audio stops.)

                    MR. POLLACK:  2 minutes 12 seconds.

Q    What was your understanding of what was happening here?

A    My understanding is that Bill Young wanted the money

immediately, sooner rather than later.  He was getting

impatient, that he wanted to get the 3.8 million into his

account and he was upset that it was going to arrive on

Monday, which is only a couple of days.

                    MR. POLLACK:  Let's continue playing it and we'll

stop again at 7 minutes and 18 seconds.

                    (Audio plays; audio stops.)

                    MR. POLLACK:  Stopping at 7 minutes 18 seconds.

Q    What was your understanding of the statement that:  We

outsell the 3-ply to the other one at least 40-to-1.

A    I understood that to mean that the Defendant and Bill

Young were engaged in -- separate and apart from me, they were

engaged in selling both KN95s and 3-ply masks and they were

talking about the ratios of how they sold those.

                    MR. POLLACK:  We'll keep playing, Mr. Flink.

                    (Audio plays; audio stops.)

Q    I'll direct your attention briefly back to Government

Exhibit 20, which is those text messages from the Defendant's

*LAM      OCR      RPR*

RUSSO - DIRECT - POLLACK          110

phone.

(Exhibit published to the jury.)

Q   And I'll direct your attention to the very top row, which shows an incoming message from Bill Young to the Defendant.

Can you tell us the date and time when that was sent?

A   April 24, 2020, at 4:57, which would be 7:57 Eastern time.

Q   Is that the day after the phone call we just heard?

Do you want to look at Government Exhibit 103T, the top page?

A   That is correct, yes.

MR. POLLACK:  Mr. Flink, can you scan to the right?

Q   Can you read this message from Bill Young to the Defendant?

A   Give me a call in the morning.  I have a client wants a hundred thousand plus at $5.50 a mask in LA.  What do we send him?  One, an escrow agreement like Ryan or, two, a contract for PBA, me.

Q   Is the escrow agreement -- the document you received from the Defendant, was that an escrow agreement.

A   Yes.

Q   Do you know who this client in LA was?

A   No.

Q   Did you have anything to do with that at all?

*LAM     OCR     RPR*

RUSSO - CROSS - GUTMAN                    111

A    No.

          MR. POLLACK:  No further questions, your Honor.

          THE COURT:  Okay.  Mr. Gutman, do you have cross-examination?

          MR. GUTMAN:  Yes, your Honor.

CROSS-EXAMINATION

BY MR. GUTMAN:

Q    Good morning, Agent.  My name is Jeremy Gutman.  I represent Mr. Bulloch.

          We've never met before, have we?

A    Good morning.

          No, we have not.

Q    And other than on the recordings that we heard in this courtroom, have you ever spoken to Mr. Bulloch?

A    No.

Q    So, that's the only interaction you've ever had with him, are these recordings?

A    Yes.

Q    Do you recall that on the recordings you and Mr. Bulloch spoke about a concern that masks might be confiscated?

A    Yes.

Q    And do you understand "confiscate" to mean that an agency of the government takes materials from a private individual or an entity?

A    Confiscate means to take something, yes.

T. ANDERSON - DIRECT - POLLACK     122

They requested nine new helicopters.  You go through the process of designing the nine new helicopters, like you would purchasing a vehicle when you want to have this type of sound system, this type of tire, this type of interior.  That allowed me to take on the project management role for the first year -- first nine months of my employment.

Q    I want to direct your attention to March and April 2020. What in general was the condition of your hospital system at that time?

A    I would say that we were inundated with COVID.  If not every, most floors had at least a COVID patient if not the entire floor.  Daily struggles with supplies, both equipment and medical supplies.  Both of our facilities in the Middletown campus and Catskill campus set up external tents to triage the patients before they came into the ED.  Because the EDs were full of patients as well.

So I think that was similar to the rest of the United States of America based on the COVID pandemic response.

Q    How did the hospital respond to that crisis?

A    Well, from a personnel prospective, that's where I was repurposed from the project management position into the supply chain position.

Q    Why were you repurposed for that?

A    The position was vacant just through normal hiring processes of any organization.  Then with the increased,

T. ANDERSON - DIRECT - POLLACK          123

extreme increased demands, to procure, distribute and manage PPE for all three hospitals.

Q    You took on the responsibility for that?

A    As the director, yes, sir.

Q    In connection with your experience and job responsibility as director of supply chain, are you familiar with different types of protective masks?

A    Yes, sir, I am.

Q    Are you familiar with N95 masks?

A    Yes.

Q    What are N95 masks?

A    So N95 masks are also referred to as a respirator.  The 95 of the N95 title describes the particular filtration capability of the material the mask is made out of it.  The N portion is that the mask is fitted.  When I say fitted, it has two rubber bands go around the back of the head.  It fits and provides generally a seal along the bridge of your nose and along your mouth.

Q    Are you familiar with KN95?

A    Yes, I am.

Q    What are KN95?

A    KN95 are would be a step down in protection from the N95. The 95 is the same, the material has the same filtration process, but the KN95 is not fitted so it allows more air leakage across the nose and mouth.

GA48

T. ANDERSON - DIRECT - POLLACK                124

Q    In your experience, speaking generally, how does the cost of N95 compare to the KN95 masks, based on the fact that N95 is more capable?

A    The N95 is the more costly mask of the two.

Q    Are you also familiar with 3-ply masks?

A    Yes.

Q    What are those?

A    3-ply masks would be a step down from the KN95 mask.  It comes in three levels, levels one, two and three, with three being the highest of the 3-ply masks.  So in sequence:  N95, KN95, 3-ply level three, 3-ply level two, 3-ply level one.

Q    In your experience, how does the cost of the 3-ply masks compare to N95 and KN95?

A    They are less expensive.

Q    Can you rank them by cost?

A    N95, KN95, level 3-ply level three, 3-ply level two, and 3-ply level one.

Q    Before the pandemic, did the hospital buy all three levels of 3-ply masks?

A    We did not.  We focused -- the majority of our 3-ply masks were level three masks.

Q    During the pandemic did you start buying other masks?

A    Level twos and ones, just out of pure necessity.

Q    What about KN95?  Before the pandemic did the hospital provide KN95?

T. ANDERSON - DIRECT - POLLACK          125

A    No, not prior to the pandemic.

Q    During the pandemic?

A    Yes.

Q    Why?

A    Also out of necessity.

Q    Did the pandemic have -- before the pandemic, did the hospital system have relationships with established vendors that it bought masks from?

A    Yes.  We have contracts and relations with multiple vendors.  From a context of today's conversation, we have two primary vendors.

Q    When you say "context of today's conversation", do you mean --

A    The N95 masks and the 3-ply masks.

Q    During the pandemic did Garnett Health continue to buy protective masks from the same vendors as before?

A    Yes.

Q    Did the hospital buy from new vendors?

A    Yes.

Q    Why?

A    Our primary vendors couldn't resource the demand, so we had to turn to secondary vendors.

Q    Before the pandemic, did you buy only from the primary vendors?

A    Yes.

T. ANDERSON - DIRECT - POLLACK                    126

Q    During the pandemic you continued to buy from primary vendors; is that right?

A    Yes, sir.

Q    And then did you add on new vendors?

A    Yes, secondary vendors.

Q    You said a minute ago the hospital bought some KN95 masks during the pandemic, were those bought from vendors that Garnett had ever done business with before?

A    No, sir.

Q    How much did Garnett Health pay for those?

A    The average during the pandemic was $2.80 per mask.

Q    Did you create a chart to summarize information about the PPE masks that Garnett Health bought from its established vendors in early 2020?

A    Yes, sir, I did.

Q    Did you use Garnett Health's business records to make that chart?

A    Yes.

Q    Are the records voluminous?

A    Yes, they are.

        MR. POLLACK:  I'd like to show you, but not publish to the jury, a document marked for identification as Government Exhibit 200.

        Can you bring up Government Exhibit 200?

BY MR. POLLACK:

T. ANDERSON - VOIR DIRE - GUTMAN                127

Q    Do you recognize this?

A    Yes, sir.

Q    Is this the chart that you made?

A    Yes, sir, it is.

          MR. POLLACK:  The Government offers Government Exhibit 200?

          THE COURT:  Any objection?

          MR. GUTMAN:  Could I just voir dire for a moment?

          THE COURT:  Yes.

VOIR DIRE EXAMINATION

VOIR DIRE EXAMINATION

BY MR. GUTMAN:

Q    I want to make sure I understand.  Is this representing only the vendors who you dealt with prior to the pandemic?

A    Yes, sir -- not only prior, prior and during.  So our primary vendors, sir, if I may.

Q    It doesn't include other sources that you turned to for the first time during the pandemic?

A    No, sir, it does not.

          MR. GUTMAN:  Thank you.  No objection.

          THE COURT:  Government Exhibit 200 is admitted.  You may publish it to the jury.

          (Government Exhibit 200, was received in evidence.)

          MR. POLLACK:  Thank you, Judge.

DIRECT EXAMINATION (Continued)

T. ANDERSON - DIRECT - POLLACK                128

BY MR. POLLACK:

Q     Looking at this chart from the beginning of January 2020 until the end of April 2020, all together, how many 3-ply masks did Garnett Health buy from your established vendors?

A     The number shown there 411,400.

Q     For that whole time period, what was average cost?

A     Fourteen cents.

Q     During that whole time period, what were the highest price paid to the primary vendors?

A     Thirty-five cents, sir.

Q     Looking at whole period again, January 2020 through April 2020, approximately how many N95 masks did Garnett Health buy from established vendors?

A     25,440.

Q     What was the average cost per mask for that time period?

A     Eighty-two cents.

Q     Highest price paid per N95 to any of your established vendors for that whole period, January 2020 to April 2020?

A     $1.28 per mask.

          MR. POLLACK:  No further questions, your Honor.

          THE COURT:  Thank you.  Cross-examination?

          MR. GUTMAN:  Your Honor, could we just take a few minutes break because there is some materials that just became available that I need to review.

          THE COURT:  If you need more than a few minutes

JENA – DIRECT – POLLACK                    137

(Witness takes the witness stand.)

**ANUPAM JENA**, called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

THE COURTROOM DEPUTY:  Please state and spell your name for the record, please.

THE WITNESS:  Anupam Jena.  A-N, as in Nancy, U-P, as in Peter, A, M, as in Mary.  Last name Jena.  J-E-N, as in Nancy, A.

THE COURT:  You may proceed, Mr. Pollack.

MR. POLLACK:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. POLLACK:

Q    Good afternoon, Dr. Jena.

A    Good afternoon.

Q    Where do you work?

A    I work at Harvard Medical School.

Q    And what do you do there?

A    I'm a professor of care policy and medicine.

Q    And what are your -- in general, what your job responsibilities as a professor in health care policy and medicine at Harvard Medical School?

A    I do three things.

The first is I do research in health economics.

The second is I teach undergraduates at Harvard College, and medical students at Harvard Medical School.

GA54

JENA – DIRECT – POLLACK                    138

And then the third sort of category is I see patients at Massachusetts General Hospital, which is one of the largest teaching hospitals in Boston.

Q   How long have you taught at Harvard Medical School?

A   I've been there about ten years.

Q   And, in general, what are some kinds of courses have you' taught there?

A   I teach a course on health care policy and health care quality.  So how to measure the quantity of health care, health care economics issues.

I teach at an undergraduate level and also in the medical school.

Q   And what are your duties as a physician at Massachusetts General Hospital?

A   I work as an internist in the hospital setting.  So I see patients who are hospitalized for general medical conditions.

Q   And how long have you been a physician there?

A   I've been there since 2009.

Q   Do you have any other professional affiliations besides Harvard?

A   I'm an affiliate of the National Bureau of Economic Research, or NBER.

Q   And what is the National Bureau of Economic Research?

A   It's an organization of leading academic economists in the U.S.

GA55

JENA – DIRECT – POLLACK                    142

A    In economics and medicine.

Q    Have you published in medical or in the context other than peer review articles?

A    I have.

        So I've written for The New York Times.  Washington Post.  Wall Street Journal.  Los Angeles Times.  Lay press outlets like those.

Q    Have you testified as an expert witness for about economic and medical issues?

A    Yes.

Q    Have you ever been denied qualification as an expert in economics and medicine?

A    No.

Q    Have you testified as an expert in depositions?

A    Yes.

Q    Were you hired by the government to the give an expert opinion in this case?

A    Yes.

Q    What's your hourly rate?

A    It's $1,000 per hour.

Q    Did you receive data to analyze in order to form an expert opinion in this case?

A    I did.

Q    Generally, what data did you analyze?

A    There's two sets of data, actually.

JENA - DIRECT - POLLACK                           143

The first is the Premier Data.  And the second is data from New York-Presbyterian Hospital, which is obviously a large hospital system in New York City.

Q    What is the Premier Data?

A    The Premier Data -- Premier is a group purchasing organization.

What that means is that when hospitals want to purchase things like masks or other supplies, it's hard for them to just purchase them on their own, so they will work with a purchasing organization that helps negotiate prices on behalf of the hospital.

And so Premier is the largest group purchasing organization.  It has about 4,000 hospitals or health care systems that are part of it, and probably 175,000 or so other organizations; could be small physician practice, for example, that's part of it.

So that's what Premier is.  And the data that I analyzed were masks that were purchased by Premier members during the period of April -- during the period of January 2020 to April of 2020.

Q    And what, if anything, makes Premier Data or other group purchasing organization data on purchases particularly useful to analyze?

A    It's useful for a lot of things, but in this particular context, I was asked to render an opinion to calculate

GA57

JENA - DIRECT - POLLACK                    154

And I know from New York-Presbyterian that the sellers of masks in New York-Presbyterian were established sellers. So every mask that they purchased in April of 2020 was from as seller that they were already purchasing from in January or February or March of 2020 prior to the pandemic.

So that's an important point to keep in mind. These are established sellers to New York-Presbyterian Hospital.

And the price of N95 masks was roughly constant over this entire period, something around the ranges of 50 cents.

MR. POLLACK: Can we turn to the next slide, Mr. Flink.

Q     And, Dr. Jena, can you tell us what this page shows?

A     Sure. So this is a very similar schematic as what we talked about in the N95 Premier Data example, but now these are prices and quantities of 3-ply masks that were purchased by the Premier hospitals.

And just to refresh your memory, the 3-ply masks are the lower-tier mask, and the N95 are the gold standard.

So these masks are going to be cheaper because they're less effective. And we see that in the data, and you can see that in the exhibit.

So take, for example, January of 2020, each 3-ply mask in the Premier Data, the price was about five cents. So quite a bit less than the N95 mask, about five cents.

February of 2020, the median price was about

GA58

JENA – DIRECT – POLLACK                    155

six cents.  March, 7 cents.  April, 7 cents.

So if you look at this data, this is -- and these are 3-ply masks.  We're talking about 280 million masks purchased during this period by the Premier hospitals.  So that's a large amount of data information.

The price of the mask is about five to ten cents from January of 2020 up until April of 2020.

MR. POLLACK:  And if we can now turn to the next slide, Mr. Flink.

Q    Dr. Jena, can you tell us what this slide shows?

A    Sure.  So this is my final slide, and this is, again, very similar to what I showed you before for New York-Presbyterian Hospital.

So these are 3-ply masks that were purchased by New York-Presbyterian Hospital in this period from January to April of 2020.

And so you see a few things here.  Again, the 3-ply masks are cheaper.  So we see that in January 2020, the median price paid by New York-Presbyterian was about seven cents per mask.

In February of 2020, they're actually no orders, which is not surprising, because hospitals will often just buy a bunch of masks and then when they need to buy more, they might buy more.  And that can happen a month later, it can happen a week later, it can happen two months later.  So in

JENA – DIRECT – POLLACK                 156

February we don't see any mask purchases.

And then in March, in April the price of the mask goes up to 60 cents.

So I will also mention that in New York-Presbyterian Hospital, they're about 15 orders over this period, so it's not a ton of orders; whereas if you look at New York-Presbyterian's N95 purchases, we're talking about something like 450 orders.  So it's much more precise.

And you might see this reflected here because there's an increase in the price here from what appears to be an increase from January 2020 to March and April of 2020.

So if I were to put together these two pieces of information from New York-Presbyterian Hospital for the 3-ply, and from the Premier Data for the 3-ply, it looks like masks around this period are going for somewhere between --

(Court reporter interrupts for clarification.)

A    So in this period, 3-ply masks were going from between five to ten cents, it appears, and at the very maximum, you might think that they're close to 60 cents, but no more than that.

Q    Did the Premier Data and the New York-Presbyterian data include any information about the KN95 masks?

A    They do not include information about KN95 masks.

Q    Why not?

A    The reason why, because KN95 masks are not NIOSH

GA60

JENA - DIRECT - POLLACK                    157

approved, so they were not used in hospitals, at least in this country at the start of the pandemic, and again that is because the KN95 is considered to be the gold standard.

Q    Sorry, which one is the gold standard?

A    Did I say -- the N95 is considered to be the gold standard.

Q    So are you able, based on this data, to make any economic inferences about market price for KN95s?

A    Absolutely you can.  And the reason why is because the N95 mask, which are the gold standard, are going to be more expensive.

So if we observe KN95 masks that have prices that are above the prevailing market prices of N95 masks, that would be strange, because we expect, if anything, the price of KN95 masks should be lower than the price of N95 masks.

Q    So based on your expertise and your analysis of the data, in your expert opinion, can you say approximately what the prevailing market price was for N95 masks between January and April of 2020?

A    I would say based on these data somewhere between 50 cents to at most a dollar.  But the range is roughly 50 cents, at the most a dollar.

Q    And can you answer based on your expertise and analysis of these data the same question as to KN95 mask?

A    It should be less than that.

JENA – CROSS – GUTMAN                           158

Q    And as to 3-ply masks?

A    3-ply masks, I would say the range is probably between five and ten cents per mask, but at the very maximum, 50 cents.

MR. POLLACK:  No further questions, Your Honor.

THE COURT:  Cross-examination?

MR. GUTMAN:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. GUTMAN:

Q    Good afternoon, Dr. Jena.

A    Good afternoon.

Q    I'm Jeremy Gutman, attorney for Mr. Bulloch.

I want to ask you some economics questions that you're obviously over qualified to answer, might be Economics 101.

Does the United States have what's called a "free enterprise system"?

A    I would say generally, yes.

Q    And what do you understand that to mean?

A    I would interpret it to mean a free market system where buyers and sellers can engage in transactions.

There's some regulations around those, of course, but in general it's a market-oriented system as opposed to a sort of centralized planning situation.

Q    So in the -- is there a different term you would use,

211

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,    :    20-CR-181(PK)

       Plaintiff,    :

                       United States Courthouse

   -against-    :    Brooklyn, New York

KENT BULLOCH,    :

                       July 22, 2022

      Defendant.    :    9:00 a.m.

- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
BEFORE THE HONORABLE PEGGY KUO
UNITED STATES MAGISTRATE JUDGE, and a jury.

APPEARANCES:

For the Government:    BREON PEACE
                       United States Attorney
                       BY: ROBERT M. POLLACK, ESQ.
                          HIRAL D. MEHTA, ESQ.
                       Assistant United States Attorney
                       271 Cadman Plaza East
                       Brooklyn, New York

For the Defendant:    JEREMY L. GUTMAN, ESQ.
                       521 Fifth Avenue, 17th Floor
                       New York, New York

Court Reporter:    Andronikh M. Barna
                       225 Cadman Plaza East
                       Brooklyn, New York
                       (718) 613-2178

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Sidebar                                                    250

(The following occurred at sidebar.)

MR. GUTMAN:  Reincorporating all prior arguments that we've made, I move for a judgment of acquittal pursuant to Rule 29 on the ground that viewed in the light most favorable to the Government the evidence will not sustain a verdict under this statute.

THE COURT:  All right.  I deny the motion.  Thank you.

MR. POLLACK:  Thank you, Judge.

(Continued on the following page.)

Proceedings                                    376

invite them to sit and watch or to leave as they please.  All right?

And then I will ask for the Foreperson to render the verdict.

(Jury enters; 3:51 p.m. )

(Court Exhibit 4 was received.)

THE COURT:  Please be seated.

The Court has received a note that the jury has reached a verdict.

But before I get to the verdict, now that the jury has reached the verdict, the four alternates are no longer needed.  So thank you so much for your participation in this trial.  You are welcome to stay and listen to the verdict if you wish in the -- to join the members of the audience because you are now excused as jurors.

All right.  Will the Foreperson please rise.

Madame Foreperson, how does the jury find the defendant, Kent Bulloch, guilty or not guilty?

THE FOREPERSON:  Guilty.

Thank you.

THE COURT:  Thank you.

You may be seated.

Do all members of the jury agree in this verdict?

THE JURY:  Yes.

THE FOREPERSON:  Yes, Your Honor.  It's a unanimous

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Proceedings                                    377

decision.

THE COURT:  So is there any request from the parties?

MR. GUTMAN:  I'll ask that the jury be polled, Your Honor.

THE COURT:  All right.  So the request is for the jury to be polled, which means I will ask each one you individually if you agree on the verdict.

Juror No. 1?

JUROR NO. 1:  Yes.

THE COURT:  Juror No. 2?

JUROR NO. 2:  Yes.

THE COURT:  Juror No. 3?

JUROR NO. 3:  Yes.

THE COURT:  Juror No. 4?

JUROR NO. 4:  Yes.

THE COURT:  Juror No. 5?

JUROR NO. 5:  Guilty.

THE COURT:  Juror No. 6?

JUROR NO. 6:  Guilty.

THE COURT:  Juror No. 7?

JUROR NO. 7:  Guilty.

THE COURT:  Juror No. 8?

JUROR NO. 8:  Guilty.

THE COURT:  Juror No. 9?

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Proceedings                                           378

JUROR NO. 9:  Guilty.

THE COURT:  Juror No. 10?

JUROR NO. 10:  Guilty.

THE COURT:  Juror No. 11?

JUROR NO. 11:  Guilty.

THE COURT:  Juror No. 12?

JUROR NO. 12:  Guilty.

THE COURT:  All right.  Thank you very much.

So thank you so much for your service, everyone.  I know you have been very conscientious in carrying out your duties.  You are dismissed.  You are free to go.  Go back to the jury room.  I may ask you to stay for a few minutes so I can come by and thank you in person, off the record.  Thank you.

(Jury exits; 3:53 p.m.)

THE COURT:  All right.  So I would like to go and talk to the jurors myself, so if you could stay for a few minutes so we can agree on a sentencing date or other posttrial matters, if you can give me about ten minutes, I would appreciate it.  Thank you.

(Pause in proceedings.)

THE COURT:  Thank you, everyone.

So I can set a sentencing date or we can just wait to see once we get the presentence report how that pans out.

MR. GUTMAN:  That's fine with us, Your Honor.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

**From:** KENT BULLOCH <kentbulloch@comcast.net>
**To:**
**Sent:** 4/9/2020 3:40:11 PM
**Subject:** Masks.

9 April 2020

Dear Mr. Xirinachs

It was my pleasure to speak with you and Don Allen regarding the availability of the KN95 and 3 ply masks for your client. The price for the KN95 is $3.80 per mask, FOB Los Angeles with availability of 1 million masks on Monday, April 13, 2020. The 3 Ply masks are available for .74 cents per mask, with 11 million available FOB Los Angeles.

As Mr. Allen alluded to during our conversation, the KN95 are spot buys from a source that he has been purchasing masks from for the past few weeks. Even though the discussion was had on a 20% deposit to hold inventory, I would highly recommend placing the total purchase price into escrow so that the desired inventory can be immediately paid for and delivered to your client. You may also advise your client that this can be a recurring weekly event.

The transfer coordinates for my IOLTA are as follows:

Account Name: Law Offices of Kent Bulloch
Account Address: 703 2nd Street, Suite 413, Santa Rosa, California 95404
Bank Name: Citibank N.A.
Bank Address: 100 Citibank Drive, San Antonio, Texas 78245-9004
Bank Account Number:
Bank Routing Number:
SWIFT: CITIUS33

As you know I am the 3rd Party Escrow Officer that will administer the funds as they are deposited by you and your business entity, that will ensure that payments are properly distributed in a timely manner as per the terms and conditions contain within the framework of the Sales Agreement.

If you have any other questions or concerns, please do not hesitate to contact me.

Sincerely,

Kent Bulloch, Esq
Law Offices of Kent Bulloch

GOVERNMENT
EXHIBIT
**4**
20-CR-181 (PK)

BULLOCH-COMCAST-002890

**From:** **Kent Bulloch** kentbulloch@gmail.com
**Subject:** escrow agreement
**Date:** April 22, 2020 at 5:21 PM
**To:** ████████████

Here is what you asked for. Just inserted some verbiage in my existing escrow contract.
**Kent Bulloch**
Attorney at Law
703 2nd Street, Suite 413
Santa Rosa, CA  95404
Phone: 707-237-2140
http://www.divorcelawyersantarosa.com/


**PRIVACY NOTICE:**

THE INFORMATION CONTAINED IN THIS ELECTRONIC MAIL TRANSMISSION IS CONFIDENTIAL AND INTENDED TO BE SENT ONLY TO THE STATED RECIPIENT OF THE TRANSMISSION. IT MAY THEREFORE BE PROTECTED FROM UNAUTHORIZED USE OR DISSEMINATION BY THE ATTORNEY-CLIENT PRIVILEGE AND/OR THE ATTORNEY WORK-PRODUCT RULE.

IF YOU ARE NOT THE INTENDED RECIPIENT OR THE INTENDED RECIPIENT'S AGENT, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, USE, DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. YOU ARE ASKED TO NOTIFY US IMMEDIATELY BY TELEPHONE AND TO PERMANENTLY DELETE THE ORIGINAL DOCUMENT FROM YOUR FILES.

Escrow
Agree...so.doc

GOVERNMENT
EXHIBIT
**13**
20-CR-181 (PK)

# Law Offices of Kent Bulloch

703 2nd Street, 4th Floor, Santa Rosa, California 95404
Kent Bulloch, Esq.: (707) 231-2181

DATE: February 1, 2020
ESCROW OFFICER: Kent Bulloch, ESQ. (Law Offices of Kent Bulloch)
ESCROW NO: ICIG212020
ESCROW INSTRUCTIONS

**PARTIES TO THIS ESCROW:** This escrow (the "Escrow") is established by and between among Ryan Russo,a New York resident, a (hereinafter referred to as the "Client") and the Law Offices of Kent Bulloch (hereinafter referred to as the "Escrow Agent") shall act as a non-biased Escrow Agent.

**PURPOSE OF THIS ESCROW:** The Client has entered into various sales agreements for the sale of Anti-Viral Face Masks Each contract shall be lodged with the Escrow Agent, with specific instructions for cash disbursement.

**Client** understands that no more than 10% shall be allocated above costs for resale of masks. Client shall not charge more than 10% above costs to secondary buyer. For example if masks cost $5.50 clent will not resale masks above $6.05.

**Buyer** shall deposit funds into Escrow account and shall be considered to take delivery upon shipping.

The client shall provide, in writing, to the Escrow Agent any payments that are due and payable to any and all persons or entities that are to receive funds as payment from the transaction. The Client agrees that the Escrow Agent is acting as a non-biased third party to any distribution and agrees to hold harmless the Escrow Agent from any and all claims by any party that is to receive funds from said transaction.

Upon disbursement of all the funds in escrow, this Escrow is considered closed.

**RELEASE:**
   1.) The payments shall be directed to the Law Office of Kent Bulloch IOLTA Account, (details to follow)

If for International Transfers:

Account Name: Law Offices of Kent Bulloch
Account Holder Address: 703 2nd Street, Santa Rosa, California 95404
Phone: 707-322-1046
Bank: Wells Fargo
Bank Account Number: ███████████
Bank Routing Number: ███████████
SWIFT: WFBIUS6S

If for Domestic Transfers:

Account Name: Law Offices of Kent Bulloch
Bank: Citibank, N.A.
Account Holder Address: 703 2nd Street, Santa Rosa, California 95404
Phone: 707-322-1046
Bank Account Number: ███████████
Bank Routing Number: ███████████

> **GOVERNMENT EXHIBIT**
> **13A**
> **20-CR-181 (PK)**

Page **1** of **5**

**NOTICES:** All notices, requests, demands, and other communications under this escrow shall be either in writing or sent by facsimile transmission with written confirmation mailed and shall be deemed to have been duly given on the date of service if served personally, or sent by facsimile transmission, or on the second day after mailing if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed.

If to Escrow Agent:
Law Offices of Kent Bulloch
703 2nd Street, 4th Floor
Santa Rosa, California 95404
Phone: (707) 231-2181
Attn: Kent Bulloch, Esq.

**All funds received into** escrow shall be deposited with other escrow funds in a general trust account of Law Offices of Kent Bulloch unless otherwise instructed.

**Escrow Agent is not a party to, or bound** by, any provisions contained in any Deposit which may be deposited under, evidenced by, or arise out of these instructions, and with respect thereto, acts as a depository only and is not responsible or liable in any manner whatsoever for the sufficiency, correctness, genuineness or validity of any Deposit or with respect to the form or execution of the same, or the identity, authority or right of any person executing or depositing the same.

**Escrow Agent shall not be required** to take or be bound by notice of any default of any person, including any Principal, or to take any action with respect to such default whether or not such action involves any expense or liability. These instructions shall not be subject to modification or rescission except upon receipt by Escrow Agent (at the office named above) of written instructions from each of the principals or their successors in interest, and no such rescission or modification shall be effective unless consented to by Escrow Agent in writing.

**Escrow Agent shall be paid** as a paymaster and process facilitator .1 of net profit. Defined as total invoice sell less cost of goods.

**This Agreement and the exhibits attached** hereto contain the entire agreement of the parties with respect to the subject matter of this Agreement, and supersede all prior negotiations, agreements and understandings with respect thereto. The parties agree that any action in relation to an alleged breach of this Agreement shall be commenced the later of one-month of the date of the breach, or the date the breach is discovered. Any action not brought within that one-month time period shall be barred, without regard to any other limitations period set forth by law or statute. If any provision of this Contract is held unenforceable, then such provision will be modified to reflect the parties' intention. All remaining provisions of this Agreement shall remain in full force and effect.

**The Principals hereby indemnify** and hold Escrow Agent harmless against any loss, liability, damage, cost or expense, including reasonable attorneys' fees, (a) related in any way to Escrow Agent's acting upon any notice, request, waiver, consent, receipt or other paper or document believed by Escrow Agent to be signed by Principals or any other proper person, and (b) incurred in connection with any act or thing done hereunder.

**The Escrow Agent shall not be liable for any error** of judgment or for any act done or step taken or omitted by it in good faith or for any mistake of fact or law or for anything which Escrow Agent may do or refrain from doing in connection herewith, except its own gross negligence or willful misconduct. Escrow Agent shall have duties only to the Principals, and no person shall be deemed a third-party beneficiary of these instructions. The Parties hereto, fully understand and acknowledge that Escrow Agent is not making any representations, warranties or claims as to the validity or authenticity of the Bond or the value of same

and that all Parties have relied on their own investigation and due diligence, and have not relied on any representations or statements relative to the value of the Bond or the authenticity of same.

**Escrow Agent may consult with legal counsel** in the event of any dispute or question as to the construction of these instructions or Escrow Agent's duties thereunder, and Escrow Agent shall incur no liability and shall be fully protected in acting in accordance with the opinion and instructions of counsel.

**In the event of any disagreement between the Principals**, or any other person or persons whether or not named in these instructions, and adverse claims or demands are made in connection with or for any of the Deposit, Escrow Agent shall be entitled at its option to refuse to comply with any such claim or demand so long as such disagreement shall continue, and in so doing, Escrow Agent shall not be or become liable for damages or interest to the Principals, or any of them, or to any other person or persons for Escrow Agent's failure or refusal to comply with such conflicting or adverse claims or demands. Escrow Agent shall be entitled to continue so to refrain and refuse so to act until:

(a) - the rights of the adverse claimants have been full adjudicated in a court assuming and having a jurisdiction of the claimants and the Deposit; or

(b) - all differences shall have been adjusted by agreement, and the Escrow Agent shall have been notified thereof in writing by all persons deemed by Escrow Agent, in its sole discretion, to have an interest therein.

**In addition, Escrow Agent in its sole discretion,** may file a suit in interpleader for the purpose of having the respective rights of all claimants adjudicated, and may deposit with the court all of the Deposit; and the Principals agree to pay all costs and counsel fees incurred by the Escrow Agent in such action; said costs and fees to be included in the judgment in any such action.

**In consideration of acceptance of this appointment** by the Escrow Agent, the Principals agree to indemnify and hold Escrow Agent harmless as to any liability incurred by the Escrow Agent to any person, firm or corporation by reason of its having accepted same or in carrying out any of the terms hereof, and to reimburse Escrow Agent for all its expenses, including among other things, counsel fees and court costs incurred by reason of its position or actions taken pursuant to these Escrow Instructions. The Principals hereby agree that the Escrow Agent shall not be liable to any of them for any actions taken by Escrow Agent pursuant to the terms hereof.

**Escrow Agent is hereby authorized**, in its exclusive discretion, to obey and comply with all writs, orders, judgments or decrees issued by any court or administrative agency affecting any money, documents or things held by Escrow Agent. The Escrow Agent shall not be liable to any of the Parties hereto, their successors, heirs or personal representatives by reason of Escrow Agent's compliance with such writs, orders, judgments or decrees, notwithstanding such writ, order, judgment or decree is later reversed, modified, set aside or vacated. Any controversy, claim or dispute arising out of or relating to this Agreement, shall be settled solely and exclusively by binding arbitration in San Francisco, California. Such arbitration shall be conducted in accordance with the then prevailing commercial arbitration rules of JAMS/Endispute ("JAMS"), with the following exceptions if in conflict: (a) one arbitrator shall be chosen by JAMS; (b) each party to the arbitration will pay its pro rata share of the expenses and fees of the arbitrator, together with other expenses of the arbitration incurred or approved by the arbitrator; and (c) arbitration may proceed in the absence of any party if written notice (pursuant to the JAMS' rules and regulations) of the proceedings has been given to such party. Each party shall bear its own attorney's fees and expenses. The Parties agree to abide by all decisions and awards rendered in such proceedings. Such decisions and awards rendered by the arbitrator shall be final and conclusive. All such controversies, claims or disputes shall be settled in this manner in lieu of any action at law or equity; provided however, that nothing in this subsection shall be construed as precluding the bringing an action for injunctive relief or other equitable relief. The arbitrator shall not have the right to award punitive damages or speculative damages to either party and shall not have the power to amend this Agreement. The arbitrator shall be required to follow applicable law. IF FOR ANY REASON THIS ARBITRATION CLAUSE BECOMES NOT APPLICABLE, THEN EACH PARTY, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY AS TO ANY ISSUE RELATING HERETO IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM

ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER MATTER INVOLVING THE PARTIES HERETO.

**If any action is brought to interpret or enforce these instructions**, or any part hereof, the Principals jointly and severally agree to pay to Escrow Agent all Escrow Agent's fees, accounting fees, special and extra service fees, and other costs related to such action.

**In the event the Escrow established hereby is canceled**, the Principals jointly and severally shall nevertheless pay to the Escrow Agent the initial fee together with all costs and expenses of Escrow Agent. Notwithstanding anything in these instructions to the contrary, Escrow Agent may, in its sole discretion, upon ten (10) days written notice to any of the Principals, resign as Escrow Agent and Escrow Agent shall be entitled to reimbursement for those costs and expenses incurred to the date of such resignation. Upon cancellation by the Principals or resignation by Escrow Agent, after deducting Escrow Agent's fees, costs and expenses, the balance of any funds or Deposit shall be returned to the respective Principals who shall have deposited same.

**In the event that:**
   (a) the Escrow Agent performs any services not specifically provided herein or
   (b) there is an assignment or attachment of any interest in the subject matter of the Escrow established hereby or any modification thereof, or
   (c) any dispute or controversy arises hereunder, or
   (d) the Escrow Agent is named a party to, or intervenes in, any litigation pertaining to this Escrow or the subject matter thereof, Escrow Agent shall, in addition to fees and charges for ordinary services, be reasonably compensated therefore and reimbursed for all costs and expenses, including but not limited to attorneys' fees, occasioned thereby.

**The Escrow Agent** shall have a first lien on the Deposit for such compensation and expenses, and the Principals agree jointly and severally to pay the same to the Escrow Agent.

**These escrow instructions are not intended** to amend, modify, or supersede any prior contract or agreement that may contain certain contingencies by and between the Parties that may not be set forth in these instructions. Escrow Agent is a party only to these instructions and shall have no responsibility for the enforcement or adhere to any other agreements of the Parties.

**These escrow instructions may only be amended by a writing signed by all Principals**.

**This escrow shall be considered closed on the earlier of** (a) the disbursement of the Deposit, or (b) December 31, 2020. Escrow may be renewed by mutual agreement of the Parties.

**These instructions may be executed in counterparts**, each of which so executed shall be deemed as original, irrespective of the date of its execution and delivery, and said counterparts together shall constitute one and the same instrument.

 EACH OF THE UNDERSIGNED STATES THAT THEY HAVE READ, UNDERSTAND, AND AGREE TO THESE INSTRUCTIONS.  ESCROW AGENT IS NOT AUTHORIZED TO GIVE LEGAL ADVICE.  IF THE PRINCIPALS DESIRE LEGAL ADVICE, CONSULT YOUR ATTORNEY BEFORE SIGNING.

**Escrow Agent:**
**LAW OFFICES OF KENT BULLOCH**

By: _____
Name: Kent Bulloch
Title: Escrow Officer
DATED: April 22, 2020

**Client:**

By: _____
Ryan Russo
DATED: April 22, 2020

**From:** **Kentbulloch** kentbulloch@gmail.com
**Subject:** Re: escrow agreement
**Date:** April 23, 2020 at 12:55 PM
**To:** Ryan Russo ▮▮▮▮▮▮▮▮▮▮▮▮
**Cc:** Bill Young wayoung55@aol.com

EACH OF THE UNDERSIGNED STATES THAT THEY HAVE READ, UNDERSTAND, AND AGREE TO THESE INSTRUCTIONS. ESCROW AGENT IS NOT AUTHORIZED TO GIVE LEGAL ADVICE. IF THE PRINCIPALS DESIRE LEGAL ADVICE, CONSULT YOUR ATTORNEY BEFORE SIGNING.

**Escrow Agent:**
**LAW OFFICES OF KENT BULLOCH**

By: _____
Name: Kent Bulloch
Title: Escrow Officer
DATED: April 22, 2020

**Client:**

By: _____
Ryan Russo
DATED: April 22, 2020

Sent from my iPhone

On Apr 23, 2020, at 9:12 AM, Ryan Russo <▮▮▮▮▮▮▮▮▮▮▮▮> wrote:

Good morning Kent,

Attached is the escrow agreement signature page.

Kind regards,
Ryan

GOVERNMENT
EXHIBIT
**18**
20-CR-181 (PK)

On Wednesday, April 22, 2020, Kent Bulloch <kentbulloch@gmail.com> wrote:
Here is what you asked for. Just inserted some verbiage in my existing escrow contract.
**Kent Bulloch**
Attorney at Law
703 2nd Street, Suite 413
Santa Rosa, CA  95404
Phone: 707-237-2140
**http://www.divorcelawyersantarosa.com/**


<u>**PRIVACY NOTICE:**</u>

THE INFORMATION CONTAINED IN THIS ELECTRONIC MAIL TRANSMISSION IS CONFIDENTIAL AND INTENDED TO BE SENT ONLY TO

THE STATED RECIPIENT OF THE TRANSMISSION. IT MAY THEREFORE BE PROTECTED FROM UNAUTHORIZED USE OR DISSEMINATION

BY THE ATTORNEY-CLIENT PRIVILEGE AND/OR THE ATTORNEY WORK-PRODUCT RULE.


IF YOU ARE NOT THE INTENDED RECIPIENT OR THE INTENDED RECIPIENT'S AGENT, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW,

USE, DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. YOU ARE ASKED TO NOTIFY

US IMMEDIATELY BY TELEPHONE AND TO PERMANENTLY DELETE THE ORIGINAL DOCUMENT FROM YOUR FILES.


<9B350114-EDB6-40D7-B075-4059A34A98BA.jpeg>

\#
April 22, 2020, 2:47 p.m. ET (duration: 30:55)

WY      Hey, how you doing?

RR      Hey, Bill what's happening?

WY      I'm not happy with you right now. I'm moving on to my next buyer. I told you, you made this, this is the third time you made an appointment with me and you didn't keep it. I don't need it. I told you not to send me emails and communicate by phone. You sent me emails that I can't open.

RR      Bill, Bill, Bill, I-I-I apologize. I apologize, I-I sent you an email that that has, uh, has some key information about the --

WY      I can't open it!  The file's too big.

RR      Okay, alright, then then we can just, we can just talk about it then. I apologize --

WY      Go ahead that's why I, listen --

RR      I apologize.

WY      I, listen to me, I will stop this tomorr-- in thirty seconds if you do not return a phone call that you're supposed to. I got other buyers --

RR      No I --

WY      -- I'm losing money here because of the fact that you don't get back like you say to. I had Kent and everybody ready to move forward. I have contracts ready to close.

RR      Bill, Bill, Bill we're gonna --

WY      Go ahead.

RR      -- we're gonna do this. I'm gonna take, I'm gonna take these million masks. Don't worry about it. I'm taking these masks. I, I'm --

-1-



GOVERNMENT
EXHIBIT
**102T**
20-CR-181 (PK)

\#

WY      But ah --

RR      -- I'm buying these --

WY      -- but you understand. You don't have the masks! You can tell me all you want but you don't have the masks, I do.

RR      No, I know, no I know you do. That's what that's what I'm saying, that's why I, I wanna buy the masks. For sure, and I'm, I'm, I'd like to do it, I'd like to close this out by tomorrow if we can. I, I wanna get this wire out --

WY      I told you before we could we could get everything closed as soon as you move the money to the attorney trust account. All these other --

RR      Yup.

WY      -- things are not important. Until the money gets to the account, you don't have the masks.

RR      Okay.

WY      Maybe you can understand my frustration here, okay, I've lost --

RR      Yup yeah.

WY      -- okay last week alone we lost over twenty million masks because people did like you're doing. Instead of sending their money to the attorney trust account, they went, they're gone.

RR      Alright well --

WY      And they're not coming back.

RR      Listen, I'm a real buyer and, and let's, let's take a deep breath. I apologize --

WY      I am, I'm sorry.

## GA78

\#

RR      I'm sorry.

WY      I didn't take a [UI]. I'm just frustrated because I, I had Kent standing by. I actually had the contract already set to send to you. I went in this morning, I already wrote up the contract so everything is set to send to you.

RR      Well awesome, then let's, then let's move forward, let's move forward. Ah um so --

WY      Okay, we are, I just had to take a deep breath. Here's my problem that I have with this. You have to understand the situation we're dealing with, okay? Remember I told you the two and half million that were sitting there in Jersey?

RR      Yeah.

WY      I got a call this morning, they're gone.

RR      Okay okay.

WY      So you understand how quick everything's moving.

RR      Oh, I see, these things are in huge demand. No, I-I-I know it and I'm, I'm lucky to have this, uh, this opportunity so I-I-I could totally --

WY      I [UI] you understand, what uh, it's my reputation with my buyer, understand –

RR      [UI]

WY      -- don't want to ruin my stuff is what my issue is. Go ahead.  We're good, I'm just frustrated.

RR      No, I'm gonna make you look good with the buyer.

WY      Go ahead though read me, read what it said.

RR      Don't worry, I'm not, I'm gonna make you look good with your buyer, trust me. This is --

-3-

#

WY      Go ahead.

RR      -- this is gonna happen. So what I'd like to do is, I
        I'm, I'm interested in the 3-plys but first I wanna
        take those N95s 'cause those are the, those are the
        hottest ones that everybody wants, so --

WY      Yup.

RR      -- let's focus just, just on those million N95s. I
        want those, I wanna pay for those by tomorrow, okay?
        That's my, that's my goal --

WY      Okay.

RR      -- but ah that's my [UI] --

WY      Hey, hang on, let me, let me add Kent in hang on, hang
        on. Hang on.

RR      Yeah, yeah, yeah.

WY      And this way I don't have to repeat and I don't make a
        mistake. Hang on.

RR      Sounds good.

WY      Hang on.

WY      Go ahead, both of you guys together.

KB      Hello.

WY      Ryan?

RR      Yup.

KB      Yeah.

WY      Kent, Ryan?

RR      Hi.

-4-

GA80

# 

WY        Go ahead.

KB        Right, I'm here. Hi Ryan ,this is Kent Bulloch --

RR        Hello Kent.

KB        -- nice to meet you.

RR        Kent, very nice to meet you. How are you?  Ryan Russo.

KB        I'm doing --

WY        And Kent did get your email.

RR        Ah oh --

KB        I, I did get your email [UI]

RR        -- oh you, you did the email.

KB        Yep.

RR        Okay that's great.

KB        Great.

RR        Yeah and I, I just want apologize I, you know, I, I was, uh, gonna call at um, at two, but, ah, I, I just wanted to make sure, I've been jocking around, moving some funds around and stuff like that and I wanted to get that, um, that that attachment to you, just so we could talk about, you know, how we can maybe arrange, arrange this deal going forward so I wanted to send that email to you first, so I apologize for the little delay in time here.

KB        Okay, um --

WY        And just real quick, I explained to Kent why we're, uh, Ryan, why we're kinda pushing a little bit because, for instance, those two and half million masks that were available this morn-- ah, were available yesterday -- they're gone. We, we actually had clients we bought over twenty million in masks to

-5-

\#                 clients that didn't fulfill their obligations, and I told him I'd been frustrated with him earlier, and Kent you know I was, so --

KB       Yes.

WY       -- now we're all back on the same page. [Laughs]

KB       Yes, that's, the thing with it is that what's happening out there is that, I think that people are starting to read the writing on the wall and realizing there's going be a real shortage of masks. They cannot make the number of mask they're going to need, because Americans need to get back working and there's just no way, um, the production level is set up for, for you know, one percent of what we're gonna need. So people are starting to realize that there's a real profit to be made, and they're jumping on it so fast, that for us to get in line, what we need is to be able to say, show proof of funds, and then pay the moment the masks arrive. You know, show up pay for them, collect the masks, distribute, and as long as we do that, we can get, uh, you know, a very large supply of masks but --

RR       That's great.

KB       -- we are only as good as the money we sell. And --

RR       Right.

KB       -- other than that, they, because people keep showing up saying, well I wanna get the product, then pay, or, ah, and nope it doesn't work at all, or, Hey, um, I mean we've run into that you gotta be careful because the government will take the masks. You know, it's just everything about this is [UI] because everybody including the government realizes we're gonna be short.

RR       Right.

KB       Like and --

RR       Exactly.

-6-

\#

KB      -- and so that's why, you know, so Bill and I get a little frustrated, because the truth is, when we see it, when they sit there and say okay I think we've got a buyer for this and then the buyer doesn't put up the cost, it's like shoot, man, we could have gotten somebody else, but, you know, we're not trying to sell the same mask to three different people, [Laughs] we're trying to do it to one.

RR      Right, right. No, I, I understand that, listen, hey, you know I, I live in New York --

WY      Now, Ryan, let me ask you one question real quick. We sent you the thing for a million, okay? If you, because you're, the way that you're going to be ordering it, and the way that it's going to be coming in, did you want a bigger number than the million? Because as long as that money's sitting in the attorney trust account, we can make the order bigger.

RR      Okay, okay, listen let let's ah I, I am gonna wanna do this on a, an on-going basis. I would like to first secure those million initially like by tomorrow –

KB      Perfect.

RR      Uh, by getting you the funds for that by tomorrow. Um --

KB      Okay, so --

RR      You know, Kent like I was saying, I, you know I live in New York, and you know, the governor has, you know, now he's you know requiring everybody, and this is probably all over the country, everybody to wear these masks and stuff like that, so it's, I know these things are scarce, these things are being snapped up, and I just see this as an opportunity. I'm not gonna, I'm gonna come through for you guys, because I see this as an opportunity for me to make a tremendous amount of profit and I, I, I intend to move forward very quickly on this. So --

-7-

\#

KB      Okay great.

RR      -- look no further for your buyer.

KB      So, whatever you put in, whatever you put into the IOLTA account will be used to buy the masks. And --

RR      Perfect.

KB      -- the thing with it is, you can start with whatever number you want, we'll buy what we can get with it, and, um, we'll rotate it through as fast as possible, um, but the thing I want you to know is that what you said isn't going to happen. You said you want to get the masks tomorrow. If you get the money --

RR      No, no, no, no --

KB      -- from this [UI] in, if you get the money into my account, we go get in line, okay, we show proof of funds, and then we're next in line, and the soonest we're talking if I had the funds even today, okay, I would be, go and get in line with the manufacturers, um, and I'd say okay here's my proof of funds, here it is, it'd be Monday or Tuesday, best case scenario.

RR      Right. Okay, no I, I, I meant that I would send the funds. I didn't mean get the masks by tomorrow.

KB      Okay.

RR      I meant send the funds.

KB      Okay.

RR      And I, oh but I misunderstood, I thought that Bill said that they were in the country. Or --

KB      No, no --

RR      -- that they were in California or something like that.

#

KB        -- they, they are, the thing is that they, they keep getting sold. So, like, we had two and half million in a warehouse yesterday, they're sold today. Okay? [Laughs] So, we weren't in line. So, there's a chronic amount of masks coming into this country, every single week there's, um, the suppliers are delivering more and more. The problem is every single mask is getting sold every time, so --

RR        Right.

KB        -- so when they're in this country, yes, but [Laughs] you know, that's kind of a, uh, a misnomer because they're in this country and they're sold. [Laughs] So that's what we're gonna get in line for.

RR        Okay so what I'd like to do is just over with you if you don't mind, and I don't know if you had a chance to look at what I sent you, um, that email. I don't know if you had a chance to look at that.

WY        I couldn't open it either way, so please review it.

KB        Um, and the thing is, um, what I saw was the spreadsheets that was, um --

RR        Right.

KB        -- that had basically the, the break down on the numbers, and it looked exactly the same as what Bill was saying, it was, um, but you did it into specific, uh, lot numbers, um, whereas he had it just on the -- it was a little bit different format I guess is what I should say, but it looked fine to me.

RR        Okay good. So let me, let me just explain to you like how, how I would like to do this if we can, if possible because, you know, like you said, um, I just wanna make sure that, you know, first of all, we secure these masks right away, you know, pay, get, pay for them, secure them, and keep them keep them, you know, for, for me. And, um, that's the first thing obviously, so, I know, I want, I wanna just start like

| # | I said with the KN95s. Those are the ones I want first. I want a million of those. So, so -- |
|---|---|
| KB | Okay. |
| RR | -- that would be, the cost, you know, is, it's, it's three dollars and eighty cents a mask, for the thing, which is, which is -- |
| WY | Four ten. |
| RR | -- great. |
| WY | Four ten. |
| RR | Yeah yup. |
| WY | Your cost is, your -- |
| RR | Yes. |
| WY | -- yes it cost you, yes correct. |
| RR | Well, it's three, three dollars and eighty cents per mask and then, and then you know then there's the commission and everything on top of that, after that. |
| WY | Correct. |
| RR | So, so what I'd like to do is I'd like to, by tomorrow, get you, wire you the money, um, three point eight million dollars so you could just show them for the purchase of them at least. You know get in line, do whatever you gotta do and then, um -- |
| KB | Okay. |
| RR | -- get for a one million masks and then what, what I'd like, I have buyers lined up in Brook-- in the Brooklyn area, in the DUMBO district by the Manha-- by the Brooklyn Bridge and all the, a couple of factories over there that will buy them from me right now for five dollars and seventy cents so what I, what I think this is beautiful the whole aspect of having you Kent, |

-10-

\# and, and involved in this as an attorney, because that's what everybody wants, wants, you know, to feel comfortable and secure about sending their money and stuff like that. So what I, like I said, I can get rid of these things at five dollars and seventy cents. So basically if I, you know, buy a million at three point eight eight million, I sell them at five point seven, that's one point nine million in profit. What I'd like to do, and you're gonna have these masks. You'll control them, I'll give you the money, you secure them, you hold the masks, or whatever secure them, temporarily, I sell them --

WY  Yeah, we, I made sure you didn't get invoiced on it. And, and he said they'll come hold them, just so you know I already discussed that with him as you and I discussed yesterday Ryan.

RR  Excellent. Excellent. Okay so, so that would be the profit so the way I'd like to do this then, Kent, if you could if you would be able to act as the paymaster not only for me sending the money for the purchase of these masks for three point eight, but would you be --

KB  Uh huh.

RR  -- able to also on the other end, I have like probably, I don't know, seven to ten buyers for these million masks. I'd like them to send the money to you, um, and then and then get it distributed --

KB  Okay.

RR  -- would that be possible?

KB  Absolutely, that's totally possible.

RR  Yes.

KB  Yup.

RR  Okay.

KB  Certainly.

-11-

\#

RR       So in that case, so in that case, it's the one point
         nine million, if I, uh, if I turn these right around
         for five and then, I was just proposing that Bill gets
         ten percent of the profit, Kent for your do you know
         what you're doing as the paymaster, you get ten
         percent, and then I get the eighty percent. So you
         each would get a hundred, a hundred and ninety
         thousand dollars. Um --

BY       That works.

KB       Yes, that's fine.

RR       So, so you'd get, you'd each get, and then I'd get,
         and then when you pay it out, you'd pay me, I make one
         point five million but you would pay me out five point
         three million because I, you know, I fronted the three
         point eight million plus my profit.

KB       Okay, well, and I'm fine with doing that, the one
         question I'd have for you, is maybe what we want to do
         is, when the money comes in, to use that three point
         eight million to buy the next set of masks and --

RR       Okay.

KB       -- I distribute those out to you, the difference but I
         keep the three point eight to roll it into the next
         buy. Um --

RR       Yeah that makes sense --

KB       -- either way, it just, that would be a lot more
         efficient.

RR       Yeah, that makes sense, that makes sense. So, so I
         think that would be perfect, if we, you know, if we
         did it, the flow like that, and we just all we divvy
         up the, we all share the one point nine profit like I
         said, you can have each get ten percent and I get
         eighty percent, and then, but the one thing I wanna be
         very careful about is you know, if like for the

| # | invoice, I don't know if Bill or Kent or something like that -- |
|---|---|
| WY | Everything goes through Kent. |
| RR | -- so I'm, I'm selling it for five dollars, five dollars and seventy cents a mask, I mean I, I wanna -- |
| KB | Mm-hm. |
| RR | -- be very careful, and I, can you send me an invoice saying that I purchased, that you sold it, that somebody sold it to me for five sixty, 'cause I don't wanna, I don't want it to look I'm gauging or anything like that, I wanna, I only want it to look like I'm making ten cents on each mask -- |
| KB | Right. |
| RR | -- so is it, can I get an invoice -- |
| KB | Uh, the thing is we can make up invoices and send you invoices, just, but, I mean, ten cents is probably, you should probably do, be doing like twenty-one cents or something like that for masks, um, which is still not price gauging. Um, when you're not doubling the price, you're well within the realms of legal argument. But I am happy to do that, but I also want to raise a separate issue. You have to be really careful on the distribution of these masks because the federal government will come in and accuse you, but if you're making one penny per mask because they want to confiscate the masks. So -- |
| RR | Right. |
| KB | -- you gotta do, if you have to show that invoice to somebody, you already got a bigger problem than you're probably gonna be able to handle.  Just so you know. |
| RR | No problem. I'm not gonna -- |
| KB | What it does do is makes you more comfortable with the people that you're selling it to, that they're not |

\#

going like, you're screwing them over and getting pissed at you. That would be --

RR      Yeah.

KB      -- a use of the, of the invoice, but as far as anything else though, it's not particularly useful because the federal government doesn't care. I already found out.

RR      Right.

KB      They don't care.

RR      And I'm, I'm not, gonna show anybody voluntarily anything. I just want it just to cover my, you know, cover myself.  Like, like you said --

KB      Yeah.

RR      -- because the government, they'll, they, you know, they're cracking down on this thing like crazy so I just wanna, I wanna keep it in my back pocket, that's all. I'm not gonna, I'm not gonna advertise it to anybody, but I don't want, I don't want them to know I'm, you know, we're only paying three dollars and eighty cents, um, I don't, you know, that, I don't want them to know. I, I'd like to, so if you could give me something whether it's ten cents, twenty cents, less than the, the five dollars and seventy cents, that would be great. Whatever you can.

WY      Uh, Kent, why don't we do it this way, we, instead of what the starting price is, starting at the four, or the three-eighty, we add in the additional ten percent for Kent and myself, now you're starting at four-fifty you know what I'm saying?

RR      Well, that's still too much of a difference from four-fifty --

WY      No I ah --

-14-

\#
RR  -- you know what I mean?

WY  -- no, you, I'm just saying --

KB  Uh, and, right. I'm happy to make it for whatever it because it really doesn't matter to us. It's just an invoice. Um --

RR  Right.

KB  -- and it --

RR  Right.

KB  -- it doesn't, you know the only thing that you get out of it is being able to say, hey, nope, this is the invoice I got, see here's what I paid. Um, the truth is that, we don't want to have a question with it because none of us need to, to go down that road, um, just because --

RR  Right, absolutely.

KB  -- but let's, we can start them in so you can send us three point eight, and we'll do a cycle and then if it works well, um, and you're happy and you want to step it up to more, great. If you want to just keep it there, we'll just keep rolling through as fast as we can.  The thing is --

RR  Yeah, no.

KB  -- the delivery's happening in Los Angeles so we have arrange shipping out there. Um, so the [UI] thing and um, the we're gonna have to [UI] there, because it's delivery in Los Angeles. Um, so the one in New York, we're gonna have to have some kind of trucking thing to, a trucking contract, which might be something that that you will want to arrange anyway just so that it's, so that's it's your supplier [Laughs]. So you know what's going on.

WY  Kent, let me ask you a question.

-15-

#

KB      Yeah.

WY      Because of all the things that are going on with us
        here, uh, what if I got with, with it I pick them up
        in California and because I, I do this, we, I don't
        have to use a, uh, tractor trailer truck, I could just
        haul them over in a box truck.

KB      In a U-haul or something?

WY      A U-haul box truck yeah.

KB      Um it --

RR      Yes, and for and --

KB      -- yeah.

RR      -- you know the, the buyers don't have a problem with
        paying for the shipping, so I'm not concerned about
        that. You know, that's gonna be on them.

RR      You know I'm gonna have them --

KB      Okay.

RR      -- and you know pay for that.

KB      So, so we can arrange the shipping but the thing is, I
        just want to make sure where it's considerably seized.
        Here's my ques-- my problem. I don't want to be liable
        for trucks driving across this country and hoping that
        they, doesn't get pulled over or confiscated or
        something. So, we have to have that discussion up
        front, that I'm happy to have, to be doing it, I just
        don't want to be sitting there saying, hey, you didn't
        give us the product because, um, the truck got taken
        in Missouri, or whatever --

RR      Yeah, we'll, we'll --

KB      -- in the middle --

\#

RR      -- you, you could do some sort of hold harmless kind of agreement or whatever you know, yeah --

KB      -- yeah, I just --

RR      -- I mean, I know --

KB      -- yeah, I just wanted to, I put my cards under the table because I don't like to have miscommunication later. I don't think we're going to --

RR      Right.

KB      -- run into this problem but on the other hand, um it's, it's a little bit that don't, you know, what if? [Laughs] You know.

RR      Right.

KB      So, that's my only issue is just, um, is just, once we pick up delivery, um, I wanna have it with a trucking company or something, and Bill I realize that you could personally do it. I got people that work for me that could, that I could pay to go do this, um, so it, that's not an issue, um, it's more of if we have a professional trucking company then they've got liability insurance and everything else and they're on the hook for anything that gets taken.

RR      Right. Alright, alright, so, so that's awesome. This this sounds great. Um, so if we could I'm, I'm gonna arrange to get that three point eight, I have the wire instructions. Bill already emailed me your wire instructions --

WY      Okay, let me just add, you kinda saw the way that I worded that, what I'm going to do is I'll put together a similar thing with the, with the mask price in there, so what I'll do is, I'll re-do the invoice the instruction, so Kent will get the instructions from you, essentially saying the price of the mask, the total price of the invoice coming in, and that you'll get [UI] accordantly. Now, Kent do we have to write that he [UI] eighty percent in the account, or do we

-17-

\#
just say that he, his funds would be held by you, without disclosing that number?

KB
Right, on the invoice we're not, on the contract agreement that we're making between the three of us okay --

WY
Yeah.

KB
-- it it should be laid out exactly. This is --

WY
Okay, good enough, done.

KB
-- just our plan, okay. But the contract doesn't need to specify the dollar amount that things are being bought and sold for. It can just be in percentages. That way it doesn't have anything on it that if, if he gets raided and they go in and they see an invoice for pot, and, but it's contradicted by our contract, it doesn't need to be. The contract can be, he gets eighty percent, we get twenty percent of any profits, or, you know, we get ten percent each but, I'm just grouping it together --

WY
Mm hmm.

KB
-- um, so we get ten percent each, he gets eighty percent of the profits, and leave the contract like that.

WY
Okay.

RR
Perfect

KB
And that way --

RR
Perfect.

KB
-- he's covered but without two documents that contradict each other. I just don't uh [Laughs], I don't want it to come back to us because they look at it and say you guys are complacent in this. This is the way it should be.

-18-

\#

RR      Right.

WY      Okay. Do me a favor, Kent, and text me over his numbers that he wants to use in the account. I'll change those numbers in those, use the percentages and send that out for Ryan so that I'll have them all set.

KB      Okay.

WY      So he's already got wire instructions so he could start the funds going, and this way here I'll make those adjustments.

KB      I think the, I don't know what it'll cost to ship it but I think you should probably put enough funds in to just cover any shipping costs even if we're gonna be paid at a different point, um, when I get it --

RR      Right.

KB      -- when I take possession, I'm gonna have to have, I don't, I'm not gonna leave there until it's ours, just leave it in the warehouse. [Laughs]You know, I'm gonna have --

RR      Right.

KB      -- to make sure and just so you understand, I'm probably going to have to go there and do this in person because I am so worried about doing any kind of electronic, um, instructions with -- and it's not that big of a deal, it's a nine hour drive for me -- but it's, um, I'm going to make sure that we're not exposing ourselves, uh, to, um, having this stuff taken. I'm going to take care of it personal.

RR      Thank you. And that's and that's where that's why it always good to have an attorney involved so --

KB      Yeah.

RR      -- that, that's a good I, I appreciate that. I appreciate that.

```
#
WY        Okay.

KB        Uh, down the road, I think it'll be automatic but the
          first time I'm gonna make sure [Laughs] that
          everything's gonna go smoothly. So yeah --

RR        Yeah good.

KB        -- I need to put in enough money to cover any
          transportation costs just because, um, I'm gonna have
          to pay for that up front. I'm pretty sure and I don't
          know what it'll cost, twenty thousand maybe, you know,
          is a guess. I, you got, you can look it up and it
          might be two thousand, I don't care. I just don't
          wanna have --

RR        Right.

KB        -- not enough.

RR        Right. Yeah, no, that that makes sense. So, Kent, the
          other thing if, if I could request of you is, um, you
          know with the buyers I have lined up right now that
          I'm gonna flip them to for five-seventy, um, can you,
          can you just do me like a generic letter saying that
          you, you know, you're the, you know, because I want
          them to know that they're gonna send the funds for the
          purchase direct to you, can you do some sort of
          generic letter saying, send, you know, remit funds,
          for the, you know, remit funds whatever and, and for
          your wire instructions, and then and then say
          something like, um, you know, disbursement of, you
          know, ten, you know, no more than ten cents or
          something like that, something like that. No more than
          ten cents will be, you know, paid for logistics and
          financing or something like that. Just, just so they
          know where to send the money, and they don't, and they
          don't think I'm, you know, making a shit load of money
          on this thing.

KB        Right, no, I get it, I get what you're trying to
          protect yourself with and, um, we'll work something
          out on that. And, um, I'll get you something on that--
```

-20-

\#

RR     Awesome.

KB     -- I have to kinda think about how I want to phrase it because I don't want to create exposure for myself either but I'll do something along those lines.

WY     What, what, what about --

RR     Yeah.

WY     -- just doing it a genetic saying, I have the masks that are available, invoices are available to be purchased, and here's my IOLTA account, uh, everything must go through the account accounts. Everything must be present in the account before masks are dispersed.

KB     It, it's more if he wants to also put down that, that um, that basically, he's trying to be able to say to people, look, I'm not making more than ten percent on this, see this is, you know, that um, so that it needs to say that --

RR     Right.

KB     -- no, masks won't have more than a ten percent markup to cover costs. Um --

RR     Right.

KB     -- something to that effect. But that he's got the ability to say look [Laughs], I'm making a little bit of money on this but I'm not, I'm not, uh, you know, making a ton.

RR     Oh yeah. I don't, I don't, I don't want them to know I'm making a killing here, is basically it, and --

KB     Yeah, no, I get it.

RR     -- 'cause that would be a red flag --

KB     Yup. Yeah. I get it.

RR     -- that would be a red flag.

-21-

GA97

#

KB      And, exactly, and the thing is, that, th-- we don't want any red flags for you, because the truth is that, um, any red flags for you would be red flags for us.

BY      [UI] for us. [Laughs]

KB      So, um, and I don't look good in orange. I got nice pinkish skin. [Laughs] I don't need the -- I don't need orange to clash with it.

RR      Yeah, I'm with you.

WY      I, I got orange I'm in Arizona. Anyway that's that. [Laughs]

RR      I'm with you, that's [UI] let's all, let's all just take care of each other, and, and just if we could paper this nicely and, and with --

WY      Also Ryan, too, is you wanted to discuss is you said that you had some money that you wanted to bring off shore once this got rolling, so if you wanted to do that, we, with your second round of funds, then you pull your index [UI] and then you want to take that out as cash or, or want to do whatever and then send somebody offshore money, you, as soon as the money --

RR      Yeah.

WY      -- clears the account, you can use that. So if you're wanting to bring some of that money in then it's gonna say it's better getting up, uh, a million you're paid up for five million and then that you moved that money in that's sitting there, and you have the money to take down the masks, and you get to put that money through, then when your luck hits you're also -- just a suggestion.

RR      Yeah, absolutely, absolutely. And Kent this, this could be a, this'll be a discussion for another day down the road but basically --

KB      Sure.

-22-

\#

RR     -- I, I do stock promotions for --

WY     I already discussed it with him.

KB     Oh yeah, he told me.

RR     -- oh okay.

WY     I told you, I told him everything.

KB     So here's the thing, what I want to start with is let's get the million bounce rolling and, uh, make that work, and then we can make it a fast steady thing if we get we can make it work. The thing is we're dealing with, how fast can we get the masks to New York to get a turn around? [Laughs] You know --

RR     Right, yup.

KB     -- because that is, that is the one big thing is that if it takes two weeks to get the turnaround then it, you know, we're not gonna get a lot of, a lot of cycles in, but if we can get this done in you know four day increments [Laughs], then, then it, we could cycle through this very quickly.

RR     Awesome, awesome. Listen, this, this is reason I love having an attorney involved. Bill, Bill's been fantastic. I appreciate it. I want all of us to share in the profits in this, and I think we can keep, keep this going, you know, cycle after cycle, but like you said, let's, let's get these [UI] --

KB     Right.

RR     -- I'll, I'll work on getting the three point eight million wired. Um, Bill if you could send me the invoice or something just, just under five dollars and seventy cents that would great. And if you, um, Kent, if you could give me that letter, you know, uh, acting as a paymaster that I can, I can have for my buyers that would be awesome.

```
#
KB        Yup --

RR        So --

KB        -- perfect.

RR        -- so I think --

KB        Okay.

RR        -- we all, we all have something to do.

KB        Okay, excellent.

KB        Alright, Ryan --

RR        Right.

KB        -- I will take on my part.

RR        Good.

KB        Then I will --

WY        I'm sorry, let's go shortly --

RR        Shoot me that stuff by today, that would be, that
          would be awesome, and then we'll get this wire --

KB        -- yup ah --

RR        -- (UI).

KB        Okay, will do so.

UM        Right.

RR        Alright, thanks guys.

KB        Right, okay, bye.

RR        Bye bye.

          (Call ends)
```